[S. F. No. 15980. In Bank.—March 3, 1939.]

SOUTHERN PACIFIC COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

James E. Lyons and R. E. Wedekind for Petitioner.

I. H. Pfaffenberger, Elmer Westlake, Edwin G. Wilcox and E. R. Hoerchner, as *Amici Curiae*, on Behalf of Petitioner.

Ira H. Rowell, Frank B. Austin, Mary J. Moran, Scott Elder and Hal F. Wiggins for Respondents.

Edward M. Berol and Reginald L. Vaughan, as *Amici Curiae,* on Behalf of Respondents.

HOUSER, J.—Pursuant to the provisions contained in Statutes 1935, page 878, as amended, in a proceeding which theretofore had been initiated by the respondent commission, an order was made by it by which minimum rates or charges for the transportation of various commodities by different types of highway common carriers, respectively, were fixed and determined. Thereafter, Southern Pacific Company, which was and is a common carrier by rail, that was relatively affected by such order, together with several other like carriers, filed with the respondent commission certain schedules or rates, wherein and whereby it was proposed that on a specified date the freight rates for the transportation of beverages (particularly beer) from San Francisco, and the adjacent area, to the city of Los Angeles and its immediate vicinity, be reduced from the flat rate of 25 cents per 100 pounds, in lots ranging from a minimum of 18,000 pounds to a maximum of 30,000 pounds (as theretofore had been established by the said order of the respondent commission for highway carriers), to a rate of 20 cents per 100 pounds in minimum lots of 50,000 pounds; furthermore, that on shipments of such beverages from San Francisco to the city of San Diego, the then-existing rate be reduced from 30 cents per 100 pounds to 25 cents per 100 pounds. Thereupon, in response to protests that had been filed with the respondent commission by various highway and water carriers, respectively, against the adoption of such proposed rates, an order was issued by the respondent commission by the terms of which, in effect, the putting in operation of such rates was suspended until further order might be made with respect thereto. With such objective in view, a reconsideration of that part of its former order, by which freight rates for highway common carriers had been established with reference to such beverages, was directed to be had at the same

time and in connection with a hearing of the matter respecting the legality or desirability of the new rates for rail carriers that theretofore had been proposed by the said rail carriers relative to which such protests had been filed. As far as is here pertinent, and without reference to detail, the general result of such combined hearing was that the respondent commission made its order by which, in effect, leave to the rail carriers to reduce the freight rates from 25 cents to 20 cents per 100 pounds in minimum lots of 50,000 pounds for the transportation of beverages from the city of San Francisco and its vicinity to the area of and surrounding the city of Los Angeles was denied. But as far as such shipments from the city of San Francisco to the city of San Diego were involved, leave to establish the proposed rate therefor was granted. Within and by the same order, the highway carriers were directed to make a specified additional charge for such transportation in those instances where the highway carrier might perform the ''accessorial'' service to the shipper not only of ''advertising'' the shipper or its product on the truck by which the beer might be transported, but also of ''pick-up'' or loading and unloading such freight. However, on rehearing by the respondent commission as to the entire order, the said ''accessorial'' order was directed to be and it was rescinded; and in lieu thereof a different ''accessorial'' charge for ''advertising'' as well as for loading and unloading such freight was directed to be made. Otherwise, as far as the instant proceeding might be affected thereby, the order which theretofore had been made by the respondent commission in the matter was left practically undisturbed. Following the rendition of such final order, on the petition of the Southern Pacific Company to this court, wherein, by specific allegations therein contained, the unlawfulness of the aforesaid order was made to appear, a writ of review was caused to issue to the end that the legality of said order might be judicially investigated, and if, as a result of such investigation, the allegations that were contained within the petition were found to be substantially supported in fact and in law, the order theretofore made by the respondent commission might be annulled and vacated.

Concededly, the specific authority, if any, of the respondent commission to make the order of which complaint is

made rests principally in the provisions of law that are contained in sec. 13½ of the Public Utilities Act (Stats. 1915, p. 115, as amended by Stats. 1935, p. 1897) as follows:

"Nothing herein contained shall be construed to prohibit any common carrier from establishing and charging a lower than a maximum reasonable rate for the transportation of property when the needs of commerce or public interest require. However, no common carrier subject to the jurisdiction of the California Railroad Commission may establish a rate less than a maximum reasonable rate for the transportation of property for the purpose of meeting the competitive charges of other carriers or the cost of other means of transportation which shall be less than the charges of competing carriers or the cost of transportation which might be incurred through other means of transportation, except upon such showing as may be required by the commission and a finding by it that said rate is justified by transportation conditions; but in determining the extent of said competition the commission shall make due and reasonable allowance for added or accessorial service performed by one carrier or agency of transportation which is not contemporaneously performed by the competing agency of transportation."

However, with respect to such authorization, petitioner asserts that its apparent effect is qualified and restricted by provisions of a later statute enacted in 1937, designated as section 32–d (Stats. 1915, p. 115, as amended by Stats. 1937, p. 2005). The following is a copy of that provision:

"It is hereby declared to be the policy of the State of California, in rate making to be pursued by the Railroad Commission of the State of California, to establish such rates as will promote the freedom of movement by carriers of agricultural commodities, including live stock, at the lowest lawful rates compatible with the maintenance of adequate transportation service.

"In any rate proceeding where more than one type or class of carrier, as defined in this act or in the Highway Carriers' Act, is involved, the commission shall consider all such types or classes of carriers, and, pursuant to the provisions of this act or the Highway Carriers' Act, fix as minimum rates applicable to all such types or classes of carriers the lowest of the lawful rates so determined for any such

type or class of carrier. This provision shall not be construed to prevent the commission from granting to carriers by water such differentials in rates as may be permitted under other provisions of law.''

In the course of much litigation that has engaged the attention of the many respective courts throughout the United States during the fifty or more years last past, great ability and energy have been devoted to a consideration of various problems of law that have arisen concerning the asserted right on the part of the state to regulate the dispatch of business of and various charges made or to be made by the several recognized public utilities. No useful purpose would be served either by a review of the historic cases wherein different phases of the general subject have been so ably discussed, or even by a passing reference to the controlling principles of law that have been therein enunciated. So well are they known and their application recognized by respective counsel in the instant proceeding that by mutual understanding in that regard many of the foundational questions which ordinarily might have occupied their attention, as well as that of the members of this court, have been assumed to exist as common knowledge. In that regard, in effect, the express or the implied stipulation of the parties includes the mutual concession that in the absence of controlling statutory authorization to the contrary, the respondent commission would possess no right to prevent the petitioner from establishing a freight rate in the premises that would lie within an elastic ''zone of reasonableness'',— which latter expression imports a rate which is confined in its maximum to a figure not so excessive as to be ''greater than the particular traffic will bear'', and in its minimum not so low that it will be destructive of the business of the common carrier, or that it will not return to the carrier at least the actual ''cost of transportation''. It also is apparent that, excepting for valuable reference to pertinent principles of law, none of the authorities cited by the respective contending parties is directly applicable to the particular situation here presented, for the reason that each of such cases was decided without reference either to the provisions that are contained either in section 13½ or in 32–d of the Public Utilities Act, or to any law of similar import; con-

sequently a discussion of such cases appropriately may be omitted.

In such circumstances, as hereinbefore has been indicated, the important question that is presented to this court for its determination relates principally to an interpretation of the language that has been employed by the legislature in its enactment of section 13½, considered in connection with section 32–d of the Public Utilities Act.

Reverting to the language employed in section 13½ of the Public Utilities Act, to which attention hereinbefore has been directed, it may be noted that, in substance, it provides, *firstly,* that, should the "needs of commerce or public interest" so require, a common carrier shall not be deemed forbidden to establish a rate which may be less than a "maximum reasonable rate"; but, secondly, considered solely from the standpoint of the issues here involved, that if the purpose in so doing should be that "of meeting the competitive charges of other carriers", etc., it may do so only after it has been made to appear that the proposed rate will be "justified by transportation conditions . . . ".

Regarding such first precedent condition to a right of a common carrier to establish a rate which would be less than a "maximum reasonable rate",—to wit, that it must appear that it is responsive to the "needs of commerce", or that it is impliedly demanded by "public interest",—in effect, it is contended by the respondent commission that the only showing of asserted merit consists of evidence from which inferences are or may be drawn, not that either "commerce or public interest" will either directly, or in anywise, benefit by the proposed reduction in rates, but rather that petitioner, in its private capacity and solely in its self-interest, will be rewarded. Specifically in that connection, the petitioner asserts:

"First, that the *petitioner* had *lost* substantially *all* of its beverage business under present 'transportation conditions'; second, it was shown without substantial conflict in the record that the reduced rates would be productive of *increased rail traffic;* and third, that there is a tendency on the part of the brewing interests to reduce transportation charges *by the construction of branch breweries in southern California* . . . " (Emphasis added.)

From its viewpoint, the fact that the petitioner has lost to the truck carriers practically all its former business of transporting beverages may be most deplorable; but in the face of the additional fact that the general public does not appear to have sustained either any direct or any appreciable detriment on that account, it is not apparent in what respect the required condition has been shown to exist. It is obvious that the pecuniary advantage, if any, which would or might result to the general public from the proposed freight reduction would be impossible of estimation or realization; that is to say, a saving of 5 cents on the transportation of 100 pounds of beer from San Francisco to Los Angeles would represent a saving of perhaps not to exceed 1/20 of 1 cent on each glass of beer that might be drunk by the general public;—from which fact it would seem apparent that the manufacturer of the beverage, and not the general public, would directly profit by the proposed change in the freight rate. Nor is it clear that if, as proposed by the petitioner, the rate should be reduced and as a consequence thereof that it would be "productive of increased *rail* traffic", how that assumed situation could be considered as being responsive to the "needs of commerce", or that it was in compliance with the demands of "public interest"; and a similar status prevails with reference to the possibility that, unless transportation rates should be reduced, the northern shippers of beer will construct branch breweries in southern California. Theoretically, at least, the State of California is a "one and inseparable" entity; and if an integral portion thereof shall suffer a given loss which may be fully compensated by a gain of identical character in another like portion of the state, it is not conceivable that, as a whole, the "public interest" will have sustained any detriment. It is obvious not only that any loss which might result in that regard would be confined entirely to the petitioner, or to the transportation business generally, but also that however much the general public, as represented by the northern part of the state, might be damaged by such an untoward happening, such ensuing loss would be completely offset by the gain which might result to southern California by reason of the establishment in that locality of the anticipated branch breweries. As far as the record herein discloses, no thirsty private individual in the universe would directly benefit by reason of the proposed freight rate reduc-

tion of 5 cents on 100 pounds of beer. To the contrary, as hereinbefore has been indicated, it is not improbable that aside from a possible increase in revenue to the petitioner, the practical result of such reduction would inure solely to the private benefit of the manufacturers of the beverage. It therefore would seem manifest that the rate reduction which the petitioner has sought to establish at least was not required by the "needs of commerce or public interest", which condition is indicated in the statute as necessarily precedent to the right of petitioner to establish "a lower than a maximum reasonable rate".

■ However, as a secondary proposition, even assuming that either "commerce" actually was in dire need of action such as that which was proposed by the petitioner, or that "public interest" was insistently demanding, or that it even impliedly required, that the freight rate on beer from San Francisco to Los Angeles be substantially reduced, that is to say, from a rate of 25 cents per 100 pounds to that of 20 cents for such poundage, not yet would it appear that by the terms of the statute, the petitioner possessed the absolute and unqualified right to establish a rate lower than that charged by its competitors for the transportation of the commodity in question. Precedent thereto, other conditions remained to be satisfied; that is to say, that if the reduction be sought "for the purpose of meeting the competitive charges of other carriers . . . ", a "showing" must be made "that said rate is justified by transportation conditions", *et cetera,* which fact must be evidenced by a "finding" by the Railroad Commission to that effect. And in the latter connection, from the record herein it is clear that, as written, whatever appropriately may be said in criticism of either the form or the substance of the so-called "finding" that was made by the respondent commission, in no sense, nor in any conceivable construction or interpretation of such "finding" may the necessary fact of justification, measured by "transportation conditions" be discovered or deduced. It thus results that, "presumptively", both the facts and the law, as provided by section 13½ of the Public Utilities Act, present a legal indication of the correctness and the legality of the order of which complaint is here made. ■ But in that connection, the additional question is suggested for determination by this court of whether the broad powers that apparently

are conferred on the respondent commission by the provisions of section 13½ are limited or restricted by the provisions of section 32–d of the act to such an extent, if at all, as to recreate or revive in the petitioner an alleged, unqualified right, which assertedly was formerly possessed by it of establishing any freight rate within the "'zone of reasonableness'', without regard to the or any possible adverse effect which a drastic reduction by it in such rates might have upon the continuation in business of the competitors of the petitioner.

Again directing attention to the provisions of section 32–d (hereinbefore set forth) it will be noted that, in substance, the pertinent portion thereof requires that the respondent commission shall ''fix as minimum rates . . . the *lowest* of the *lawful* rates'' of the several types of carriers that may be engaged in the same line of business as that which may be affected by the rate proceeding then under consideration by the commission. It is not improbable that that language, standing alone, might import an absolute right in any carrier, within the ''zone of reasonableness'' to lower the freight rate on any commodity to a point that would return to it the exact cost to it of transporting such commodity between any specified designations,—which practical result, considered from a business standpoint, might require that all other carriers of the same commodity lower their respective rates to the same level. But nowhere within the provisions of the statute may language be discovered by which properly it may be inferred that other statutes *in pari materia* are to be repealed. Besides, repeals by implication are not favored. To the contrary, even though, in some particular or particulars, the provisions of two or more statutes apparently are in conflict one with the other, nevertheless, if possible and practicable, such seeming inconsistencies should be reconciled to the end that the law as a whole may be given effect. And so in the instant matter. An explanation of the two apparently conflicting statutes produces a harmonious result. Assuming the legality of section 13½, although by its provisions, as one of its basic propositions, a carrier may be permitted to establish a rate which may lie anywhere within the ''zone of reasonableness'', nevertheless when such proposed rate is less than ''a maximum reasonable rate'' and its purpose is that of ''meeting the competitive charges of

other carriers'', such apparently absolute right is subject to regulatory precedent conditions,—with the result that, within the meaning of section 32–d, no newly proposed rate can become a *"lawful* rate'' until after it has received the ''approval'' of the commission. The proposed rate here under consideration was sought to be established *after* section 13½ became the assumed law; and if its pertinent provisions are not inimical to organic law, no legal cause for either a neglect or a refusal to make its provisions applicable is readily discernible. And since in premises such as here are under consideration, both by other special and general provisions of the act, as well as by the express provisions of said section 13½, the commission is authorized to make an order of the kind and to the extent here in question, it must follow that, in order that the provisions of section 32–d might become operative, the newly proposed rate by the petitioner must have been controlled by the condition that it was a *"lawful"* rate. In other words, in effect, within the meaning of the language employed in the particular statute, it was demanded that the new rate be a ''lawful'' rate before its other provisions would apply; and the new or ''lowest'' rate could be a ''lawful'' rate only after it had been so established in accordance with the provisions of section 13½.

In connection with the order that here is the subject of complaint, the intended fairness of the respondent commission in attempting to equalize the rates of the respective carriers is made to appear by the terms of such order regarding accessorial services in its compliance with the additional provision of the latter section to the effect that in its consideration of the question of proposed rate reductions, it should ''make due and reasonable allowance for added or accessorial service performed by one carrier or agency of transportation which is not contemporaneously performed by the competing agency of transportation''. With reference to the uniformity of such established rates and the pecuniary and other probable effects thereof upon the respective classes of carriers affected thereby, a consideration of the evidence adduced at the hearing discloses the fact and impels the conclusion that the order by which the several charges that were directed to be imposed for the performance of such services was adequately based upon substantial and pertinent evidence; and although in practice such rates and charges may

not prove to be perfect in operation with the object of securing the desired uniformity to the respective carriers, nevertheless by the express terms of the original order, as well as by those of its amendment, the intention on the part of the respondent commission to comply with statutory requirements in that regard is fairly apparent. For the service of transportation only, a flat and uniform charge is required to be made by each of the several types of carriers; and where service additional thereto, such as "pick-up" or loading, or unloading, of freight is furnished, an "accessorial" charge must be made therefor. Likewise, additional charges are imposed when means or methods may be employed for advertising the business or the product of the shipper on the transportation equipment. Apparently, at least, in all respects reasonable effort has been put forth to equalize compensation to the respective carriers. As hereinbefore has been indicated, common carriers are considered as being among public utilities. The discontinuance of the service of any one of such types necessarily would be a detriment to the needs of commerce and to public interest. In order that because of lack of reasonable compensation for its service to the public none of such existing agencies may be forced to retire from the field of its usefulness thereto, ordinarily it is regarded as incumbent upon the administrative forces of the government to make available to it proper and timely opportunity to assure its continuance in the public service. Expressly disclaiming any intention on the part of this court either directly to declare or insinuate that the petitioner herein either has endeavored or, if possible, intends in the future to "run its competitors out of business", it is manifest that public interest demands that neither by "cutthroat" nor by any other means or method should one type of common carrier be now permitted, by means of a drastic reduction in rates for transportation below the "zone of reasonableness", to work the business destruction of a competitor or competitors. Those agencies are all needed for the public good. Each has or should have and be accorded its proper place and influence in the welfare of the state. It is not to be expected that a pecuniary net profit in the conduct of the business of any individual or corporation of any one or more of the several types of transportation should be insured

by the government, but that with proper facilities and under efficient management, in the absence of too great business risks and hazards, the enterprise may be reasonably protected to the extent that an opportunity may be afforded for the transaction of its business, to the end that a fair return on the investment may be anticipated as the result of its operations. Rail carriers, truck carriers and water carriers now dominate and control the field of such business activity. Possibly within the comparatively near future another or other means of transportation may be evolved and developed, and in their respective operations the existence of the several agencies that represent present means of transportation may be seriously threatened or their destruction actually accomplished. They may be outmoded and become obsolete. The future undoubtedly will present its own difficult problems. The duty of this day does not necessarily include their solution. Nevertheless, the paternalistic effort of the present generation, ''solely with an eye to public good'', to protect or to ''regiment'' public utilities, as well as the hitherto-considered private affairs of the individual member of society, hereafter may be considered either as an indispensable element in the restoration of public confidence and business prosperity, or, to the contrary, as an immeasurable menace to constitutional liberty. But in this connection, the petitioner earnestly contends that if, in the economical and more efficient administration of its business, it be able to reduce the present rates, and in the operation thereof not only secure to itself a return of the cost of transportation, but also a profit on its investment, those other common carriers which, by reason of faulty or less efficient management, or because of inadequate equipment with which to properly handle the business, may be unable either to earn a profit or to pay the actual cost of transportation, should not be singled out and favored by having the present rate maintained. In other words, when the fact has been clearly established that by practical, efficient and satisfactory methods a financially reliable common carrier is not only ready, willing and able to lower the prevailing rate for freight transportation to a rate that is shown by the evidence to be not only within the limits of the ''zone of reasonableness'', but also that the proposed rate will yield a net profit,—in its zeal to perform its conceived duty in the premises, the concern of the commission

should not extend to the limit of "holding an umbrella" over either present or possibly future competitors, and thereupon, and by reason of its anxiety, in the interest of such competitors, deny the application to reduce the existing rate, lest by reason of their inability to meet such rate the said competitors be eliminated from the field of transportation, to the seeming detriment of the public interest. In that regard, viewed from a standpoint of consideration of the proper constitutional powers of the different departments of government, ordinarily it should be beyond fair question that, especially in the absence of legislative delegation so to do, neither the Railroad Commission nor other *quasi*-judicial agency should exercise or attempt to exercise any authority with respect to the or any policy respecting public business. In the dispatch of such business as properly may fall within either the constitutional or the conferred legislative functions of such a body, generally speaking, the law, and that only, should measure its acts. Neither the theoretical nor the practical effect of proper adherence thereto should be of concern either to a judicial tribunal or to an administrative arm of the government acting in a *quasi*-judicial capacity. Its plain and proper duty in that regard should end with its declaration of its conception or interpretation, or construction, of the law as applied to the facts at hand. In the estimation of those expert in knowledge of basic principles of civil government, to go beyond that amounts to a usurpation of functions not contemplated either by constitutional guaranties or limitations.

But, as an exception thereto, herein it would appear that, by constitutionally authorized delegation of authority, at least impliedly, the legislature has waived its natural prerogative, in that it has conferred power upon its agent, the Railroad Commission, to determine not only the status of "transportation conditions", but also to conclude whether a proposed charge or rate for specified freight will or may be "justified" thereby. In the language of the statute, the Railroad Commission is charged with the particular duty of "finding" whether a proposed rate "is justified by transportation conditions"; that is to say, among other things, it is charged with the duty of weighing and considering each and all of the several and various pertinent facts and elements that should furnish a foundation for a "finding" or conclu-

sion as to whether the effect of the proposed rate will redound to the ultimate best interests of the general public. But that specific legislative fiat, complete as it may be both in its direct and in its implied expression, does not constitute the law in that regard in its entirety. The Highway Carriers' Act (Stats. 1935, p. 878) presents further indication of the public will with respect to the legal establishment of an equality or uniformity of rates (the particular service rendered being given consideration) for transportation of freight as among all the several types of common carriers and contract common carriers throughout the state. And not only does that act require that a uniformity, as far as may be *quasi*-judicially determined, may be caused to exist, but also (efficient and economical management assumed) that only such rates may be established as shall tend to preserve to the public, on a reasonable basis, a continuance of each of the several types of transportation. In that connection, especially, should be noted the inclusive language of the preamble to that act, as well as that employed in section 10 thereof, to which reference readily may be had. It thus becomes apparent that public interest has been accorded official recognition of its paramount importance, with the result that as far as individual or corporate rights, marked by private ownership of so-called public utilities, are concerned, they must yield especially whenever either the question of prospective gain or profit derived or derivable from such agencies, or that of discretion with relation to the management thereof, may come in conflict with the progress or the maintenance of the public good.

As hereinbefore has been indicated, the respective litigants in this controversy are in harmony one with the other with respect to the legal conclusion that a "zone of reasonableness" exists in the matter of fixing freight rates, within which, ordinarily, and in the absence of either express controlling statutory provision, or judicial construction thereof to the contrary, a common carrier has the right, in the exercise of its managerial discretion, to establish and maintain any desired rate. In addition thereto, it is conceded by the petitioner that since the business of a common carrier is affected by and with "public interest", the basic right of the carrier to manage its business in its own way and in accordance with the dictates of its own managerial

judgment, at least at this day, is subject to the right of the public, acting through its authorized agency or agencies, to *regulate* the business of the common carrier. Primarily, the difference in opinion as between the respective parties hereto relates to the extent of "regulation" which may be legally recognized as being within the constitutional powers of the regulatory body.

Otherwise, and concretely stated, the question is,—conceding that section 13½ provides specific statutory authority for the making of the order of which complaint is here registered,—whether the substance of such order is regulatory, or, to the contrary, whether it constitutes a taking of property, or the use thereof, without rendering either adequate or any compensation therefor.

■ As hereinbefore has been made to appear, the carrier is authorized to establish a rate lower than that which is "lawfully" charged by its competitors, only after, by a proper showing, it is able to secure from the commission a "finding" to the effect that the proposed rate is "justified by transportation conditions". But even then, as is conceded by the respective litigants herein, the common carrier is limited to the extent that it may not establish a rate that is "unreasonably low";—that is to say, that in no event may the carrier be authorized to maintain a rate that will not yield to it at least the actual cost to it of transporting the commodity upon which the new rate is proposed to act. It is well settled that a given rate properly may be adjudged to be too low, as well as that another rate likewise may be determined by the commission to be too high. (*United States* v. *Illinois Cent. R. R. Co.*, 263 U. S. 515, 525 [44 Sup. Ct. 189, 68 L. Ed. 417]; *Anchor Coal Co.* v. *United States*, 25 Fed. (2d) 462, 471; *Jefferson Island Salt Min. Co.* v. *United States*, 6 Fed. (2d) 315.)

Whether a proposed or an already established and maintained rate is "justified by transportation conditions" is largely determinable by the existence of the preliminary fact of whether it will or does return to the carrier its cost of transportation. But the answer to such question is not necessarily susceptible of the exactitude that ordinarily might be desired or anticipated. So many different factors combine to produce the ultimate result, each of which is, or at least

many of which are, or may be, dependent upon individual opinion respecting the relative value, or the percentage, or the proportion to the whole, to which it is, or they are, or may be, entitled, that when the answer is completed, in the nature of things, its correctness may not be demonstrated, and in all probability may properly be subject to much doubt and criticism. But as usually is the case with reference to a controverted question of fact, the conclusion thereon ordinarily must rest with the tribunal to which such question has been submitted for decision. Accordingly, if in the instant proceeding the ultimate "finding" of the respondent commission to the effect that the rate which was proposed to be established and maintained by the petitioner was not "justified by transportation conditions" is properly based upon the express finding that such rate was "unreasonably low", in that impliedly it would not return to the petitioner its cost of transportation, it would follow that (again assuming the legality of the enabling statute), the specific complaint which has been registered herein by the petitioner regarding the sufficiency of the "finding" in question is unavailing to it, and that no legal consequence in favor of the petitioner may be predicated upon the form of such "finding". However, when questioned, the correctness of that conclusion must finally rest on a determination of whether the evidence is sufficient to support it. ■ In that connection, it may be remembered that by the provisions of section 13½, before reaching a conclusion as to whether a proposed rate properly may be authorized by the Railroad Commission, a "finding" must be made by it to the effect "that said rate *is* justified by transportation conditions". The record herein shows that no such "finding", either in direct terms, or by implication, was affirmatively made. To the contrary, the "finding" by the respondent commission not only negatived the necessary precedent statutory condition in favor of the petitioner, but also expressly declared that such proposed rate was "*unreasonably low* and *not* justified by transportation conditions". In that regard, the complaint of the petitioner is based upon each of two fundamental points, to wit (1), that a "purported finding that the rate is not justified by transportation conditions" does not constitute a finding of fact at all, but rather that it is a conclusion of law that, to be valid or of binding effect,

should rest upon designated or specified facts; and (2), assuming the necessary and indispensable fact upon which such conclusion of law should be based was that if the petitioner were permitted to operate at its proposed rate, its cost of transportation would not be returned to it,—not only was the evidence that was adduced at the hearing insufficient to support such an assumed or implied finding, but, to the contrary, it was clear that such evidence was against and contrary to the effect of any such finding. In considering such objections, it is deemed unnecessary to devote attention either to the origin or the history of the phrase "findings of fact", so commonly used in the procedure of a trial that takes place before a court sitting without a jury.

It first may be useful to ascertain, if possible, in what sense the word "finding" was used, as it is expressed in the statute. In that regard, attention is directed to the fact that section 67 of the Public Utilities Act (Stats. 1915, p. 115, as amended by Stats. 1933, p. 1157) provides in part: that " . . . The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review except as hereinafter provided; such questions of fact *shall include ultimate facts* and the findings and conclusions of the commission on reasonableness and discrimination. . . . " (Emphasis added.)

As repeatedly hereinbefore has been indicated, the commission made the finding "that the reduced railroad rate . . . is *unreasonably low and not justified by transportation conditions.*" (Emphasis added.) And with respect thereto, specifically it is urged by the petitioner that, standing alone, without the presence of specific or essential findings upon which it must be made to rest, such "finding" is insufficient. It is important to note that by the quoted language of section 67, the commission is authorized to include *"ultimate"* facts in its findings and conclusions on *reasonableness* and discrimination. In the case entitled *American Toll Bridge Co.* v. *Railroad Commission,* 12 Cal. (2d) 184 [83 Pac. (2d) 1, 4], this court quoted from the case of *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38 [56 Sup. Ct. 720, 80 L. Ed. 1033], wherein it was said: " ' . . . Exercising its rate-making authority, the legislature has a broad discretion. It may exercise that authority directly, or through the agency

it creates or appoints to act for that purpose in accordance with appropriate standards. '. . . When the legislature itself acts within the broad field of legislative discretion, its determinations are conclusive. When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency, are met, as in according a fair hearing and acting upon evidence and not arbitrarily. . . .' ''

The petitioner has cited several recent cases (*Wichita R. & Light Co.* v. *Public Util. Com.*, 260 U. S. 48 [43 Sup. Ct. 51, 67 L. Ed. 124]; *Beaumont, S. L. & W. Ry.* v. *United States*, 282 U. S. 74 [51 Sup. Ct. 1, 75 L. Ed. 221]; *Florida* v. *United States*, 282 U. S. 194 [51 Sup. Ct. 119, 75 L. Ed. 291]; *Panama Refining Co.* v. *Ryan*, 293 U. S. 388 [55 Sup. Ct. 241, 79 L. Ed. 446]; *Atchison, T. & S. F. Ry.* v. *United States*, 295 U. S. 193 [55 Sup. Ct. 748, 79 L. Ed. 1382]; *Morgan* v. *United States*, 298 U. S. 468 [56 Sup. Ct. 906, 80 L. Ed. 1288]; *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499 [55 Sup. Ct. 462, 79 L. Ed. 1023]; *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294 [53 Sup. Ct. 350, 77 L. Ed. 796]; *Great Northern Ry. Co.* v. *Department of Public Works*, 161 Wash. 29 [296 Pac. 142]; *People's Fruit & Vegetable S. Assn.* v. *Illinois Commerce Com.*, 351 Ill. 329 [184 N. E. 615]; *Baltimore & O. R. Co.* v. *United States*, 22 Fed. Supp. 533; *Saginaw Broadcasting Co.* v. *Federal C. Com.*, 96 Fed. (2d) 554 [68 App. D. C. 282]; *United States* v. *Baltimore & O. R. Co.*, 293 U. S. 454 [55 Sup. Ct. 268, 79 L. Ed. 587]), which it is urged enunciate the rule that an ''ultimate'' finding of fact by an administrative tribunal must be supported by essential underlying findings of fact. However, it is to be observed that none of those cases presented a situation where the requirements of the particular act under review were expressed in language similar to that employed in section 67; and that although the decisions to which petitioner has referred might be most persuasive were the language of section 67 not so authoritative and inclusive, it is apparent that in the light of the legislative pronouncements set forth in that section, the several rulings indicated in the cited cases are not controlling.

In the case entitled *Valley & Siletz R. Co.* v. *Thomas,* 151 Or. 80 [48 Pac. (2d) 358], some of the cases above cited relied upon by petitioner as announcing the rule that "ultimate" findings must be supported by specific findings, are discussed and distinguished. In that case the court said:

"It is first insisted that the order of the commissioner is void, on the ground that he did not make detailed and specific findings of fact relating to the matter before him, and that the failure to make such findings of fact invalidates his entire order. This contention is based on the wording of sections 62–125 and 62–134, Oregon Code 1930. The first of these sections, with reference to investigation of rates, provides that 'if upon such investigation the rate or rates, fares, charges . . . or any joint rate or rates . . . or service complained of *shall be found to be unreasonable,*' the public utilities commissioner 'shall have power to fix and order substituted therefor such rate or rates' as he 'shall have determined to be just and reasonable and which shall be charged, imposed and followed in the future.'

"Section 62–134, as far as material here, is as follows: 'Whenever, upon an investigation made under the provisions of this act,' the public utilities commissioner '*shall find* any existing rate or rates, fares, charges, or classifications, or any joint rate or rates . . . affecting the transportation of . . . property . . . *are unreasonable,*' he 'shall determine and by order fix a reasonable rate, fare . . . or joint rate to be imposed, observed, and followed in the future in lieu of that found to be unreasonable'.

"The commissioner is granted power to change existing rates only in the event that *he finds such rates unreasonable.* The law does not confer upon him legislative authority to require the substitution of other and different rates as in his discretion he may from time to time deem desirable. He is given authority to prescribe other and different rates only in such instances *as he finds existing charges unreasonable.*

"The sections of the code above referred to *do not require the commissioner to make what commonly are considered findings of fact.* They merely provide that in the event he *finds* certain rates to be *unreasonable,* it then becomes his duty to prescribe what are reasonable rates. In the order

above mentioned *he found definitely that certain rates were unreasonable* and specified what would be reasonable rates.

"In *United States* v. *Baltimore & O. R. Co.,* 293 U. S. 454 [55 Sup. Ct. 268, 273, 79 L. Ed. 587], the court pointed out that an order of the Interstate Commerce Commission could not be supported where there was complete absence of the basic or essential findings required to give the commission jurisdiction of the matter. With further reference to this subject, the court there said: 'In the Florida Case (*Florida* v. *United States,* 282 U. S. 194 [51 Sup. Ct. 119, 75 L. Ed. 291]), the legal distinction was pointed out between what may be termed *quasi*-jurisdictional findings, there held to be indispensable, and the "complete statement of the grounds of the Commission's determination" which was declared in *Beaumont, S. L. & W. R. Co.* v. *United States,* 282 U. S. 74, 86 [51 Sup. Ct. 1, 75 L. Ed. 221 (229)], to be desirable for a proper consideration of the case in the courts. The lack of such a complete statement, while always regrettable, because unnecessarily increasing the labor of the reviewing court (compare *Virginian R. Co.* v. *United States,* 272 U. S. 658, 675 [47 Sup. Ct. 222, 71 L. Ed. 463, 472]), is not fatal to the validity of the order. It is true that formal and precise findings are not required, under section 14 (1) of the Interstate Commerce Act (49 U. S. C. A., sec. 14 [1]), which declares that the report "shall state the conclusions of the commission, together with its decision". Compare *Manufacturers' R. Co.* v. *United States,* 246 U. S. 457, 487 [38 Sup. Ct. 383, 62 L. Ed. 831 (846)]; *Meeker* v. *Lehigh Valley R. Co.,* 236 U. S. 412, 428 [35 Sup. Ct. 328, 59 L. Ed. 644 (656), Ann. Cas. 1916B, 691, P. U. R. 1915D, 1072]. That provision relieves the commission from making comprehensive findings of fact similar to those required by Equity Rule 70½ (28 U. S. C. A., sec. 723). But section 14 (1) does not remove the necessity of making, where orders are subject to judicial review, *quasi*-jurisdictional findings essential to their constitutional or statutory validity.'

"In *Wichita R. & Light Co.* v. *Public Utilities Commission,* 260 U. S. 48 [43 Sup. Ct. 51, 67 L. Ed. 124], relied upon by the appellant herein, it was held that the order of the commission failed to find the existing rates to be unjust and unreasonable, and that the commission under the Kansas law had no power to substitute other rates unless it did so find.

In support of this conclusion, the court cited *State Public Utilities Com.* v. *Springfield Gas Co.*, 291 Ill. 209 [125 N. E. 891, 902]. In the Illinois case, with reference to the duty of the regulatory body of that state, the court quoted from the Public Utilities Act as follows: 'At the conclusion of such hearing the commission shall make and render findings concerning the subject-matter and facts inquired into, and enter its order based thereon.'

"It will readily be seen that the requirements of the Illinois act are more exacting, as to what the findings shall consist of, than those of the Oregon statute. Although the Illinois case was cited by the United States Supreme Court in *Wichita R. & Light Co.* v. *Public Utilities Com.*, *supra*, there is nothing in the opinion in the latter case from which it can be inferred that anything more is necessary than the *quasi*-jurisdictional findings, that is, of the unreasonableness of existing rates.

"Following the Illinois decision is the case of *Northern Pacific Railway Co.* v. *Baker*, (D. C.) 3 Fed. Supp. 1, 6, which is based upon a statutory provision closely similar to, if not identical with, the Illinois act, requiring the department of public works of the state of Washington to 'make and render findings concerning the subject-matter and facts inquired into'.

"In *State of Florida* v. *United States*, 282 U. S. 194 [51 Sup. Ct. 119, 75 L. Ed. 291], it was held that before the Interstate Commerce Commission could fix intrastate rates, it was necessary for that body to make a finding as to the effect of such rates on interstate rates, and without such a finding it had no legislative authority to act. . . .

"As said in the case of *United States* v. *Baltimore & O. R. Co.*, *supra*, it would be 'desirable for a proper consideration of the case in the courts' that a complete statement of the grounds of the commissioner's determination be given, and the lack of such a complete statement is always regrettable. The failure, however, in a case of this nature, to make comprehensive findings of fact does not invalidate the order prescribing new rates. A 'basic or essential' finding that the existing rates are unreasonable is all that the statute demands.

"See, also, in this connection, *Mills* v. *Lehigh Valley Railroad Co.*, 238 U. S. 473 [35 Sup. Ct. 888, 59 L. Ed. 1414]." (Emphasis added.)

In reliance upon the reasoning and the authorities that thus are cited in the Oregon case, together with a consideration of the language used by the legislature of this state in its enactment of section 67, it is concluded that the finding here under discussion is not properly subject to the objections made by the petitioner, provided, of course, that it has sufficient support in the evidence.

In that connection, the petitioner urges the additional point that the provisions of law that are contained within section 13½ of the Public Utilities Act are violative of its constitutional rights in that, in effect, the statute deprives petitioner of its property without rendering to it either adequate or any compensation therefor.

Preliminarily, in accordance with authorities hereinbefore cited, it should be remembered that if a proposed rate is "unreasonably low", it is not within the "zone of reasonableness", in that, impliedly, it will not return to the petitioner the cost of transportation. However, as hereinbefore has been suggested, as to whether in fact, at the time of the hearing, such foundational condition existed is also a subject of controversy between the interested parties. It is obvious that if, in actual operation of the proposed rate, the petitioner would not receive its cost of transportation,— instead of being damaged by the denial of its asserted right to reduce freight charges, in truth, eventually, as far as might concern the particular commodity proposed to be transported, the petitioner would be the recipient of a benefit. In that connection, one of the minor reply arguments that is made by the respondent commission is that if the proposed rate were put in operation, before the petitioner would even receive as much gross revenue as theretofore it had received from the transportation of beverages from the city of San Francisco to the city of Los Angeles, necessarily, in volume, it would have to transport 29 per cent more of such freightage than it had been transporting prior to the effective date of the establishment of the new rate. On first thought, in existing conditions of competition, such a percentage requirement would seem almost prohibitive of success. But when the total number of cars of transported beverage, as compared with the quantity thereof that at present is handled by the petitioner is taken into consideration, the barrier does not seem insurmountable. To illustrate: Out of a total of

216 carloads of beer that is transported per month, petitioner has been transporting but two carloads. The requirement is not that, in order that the proposed rate may be financially successful, the petitioner must secure 29 per cent of the total of all such freightage, but that it must increase *its* present business in such transportation by that percentage. The evidence shows that under the new rate petitioner would have at least a fair chance of obtaining additional business; and if it were able to secure but a single car of new business, instead of an increase of only 29 per cent, the result would show an increase of 50 per cent. In addition thereto, but from another and separate consideration, it is apparent that at the present rate, that is, 25¢ per 100 pounds, on carload lots of a minimum of 30,000 pounds, the return to the petitioner would amount to $75 per car; whereas under the proposed rate of 20¢ per 100 pounds, in carloads of a minimum of 50,000 pounds, the return would be $100 per car; which result would indicate an increased income to petitioner, rather than that which is expressed in the "finding" by the respondent commission that the proposed rate is "unreasonably low". Moreover, on its face, by inference the record shows that the "out-of-pocket cost of transportation" from San Francisco to Long Beach is approximately 8.52 cents per 100 pounds for a 50,000 pound load; consequently that if the proposed rate were in operation from San Francisco to Los Angeles, which latter city is nearer to San Francisco than is Long Beach, the profit would be at least 11.48 cents per 100 pounds, or $57.40 per car. But in that connection, the correctness of such figures is subject to serious doubt. However, the more important question of whether any substantial evidence justifies the implied finding that the proposed rate *would not* return to the petitioner its cost of transportation, remains for consideration. In that regard, within not only the single original document that was filed by the respondent commission as its finding and order in the premises, but also in its decision on rehearing, which purportedly contains its argument, commingled with its "findings of fact", its conclusions of law and its order, *inter alia,* it is noted that, as a part thereof the respondent commission made use of the following language: "Clarence E. Day, Engineer of the Bureau of Transportation Research of the Southern Pacific Company, introduced an exhibit (No. 21) showing the esti-

mated costs of transporting beverages and tonics in lots of 50,000 pounds between San Francisco, Oakland and Sacramento on the one hand and Long Beach (used as a representative point beyond Los Angeles) on the other hand. This study indicates that the proposed rates *are more than sufficient to return the out-of-pocket cost of transportation* by Southern Pacific Company.'' Also, that thereafter, on rehearing and in response to petitioner's criticism with respect to its lack of specific findings of fact, the respondent commission declared that: ''*Assuming* but *not conceding* that the reduced rail rates *would be compensatory,* it does not follow that a reduction of the volume proposed would accomplish the desired purpose.'' (Emphasis added.)

If either of such statements properly may be said to indicate a direct conclusion, it is manifest that neither nor both of them combined respectively is or are supportive of the so-called ''finding'' that the proposed rate is ''unreasonably low''. To the contrary, to ordinary understanding, such declarations would carry the significance either that the proposed rate *would* return to the petitioner its ''out-of-pocket cost of transportation'', or, failing in that regard, that the respondent commission had reached no conclusion with reference thereto. Aside from the assertion in its brief that the evidence is ''ample . . . to support this finding'', the respondent commission has referred this court to nothing of an affirmative character that properly may be regarded as evidence in support of its conclusion. Its statement in that regard appears to be founded upon an asserted inference which, it is contended, may be deducible from two exhibits that were filed in the matter, one of which is said to show that in 1930 the rate was 35½ cents per 100 pounds, and that ''The 35½ cent rate was progressively reduced for competitive reasons until it reached the present level of 25 cents''. The contents of the other exhibit merely disclose the fact that as compared with then-existing rates between San Francisco and some other cities, as well as between Los Angeles and some other cities, the proposed rate would be considerably lower. But nowhere in either of such exhibits, or elsewhere, is the attention of this court directed to any statement or any positive evidence regarding the precise point here in dispute, to wit, whether the proposed rate would be *below* out-of-pocket cost of transportation, as hereinbefore has been

declared. The record herein reveals no affirmative evidence that could properly have been considered as negativing or controverting the evidence to which the respondent commission referred, which, in effect, was that the proposed rates were "more than sufficient to return the out-of-pocket cost of transportation". It follows that in whatever light the "finding" that the proposed rate was "unreasonably low" be viewed, it clearly was not supported by the evidence, but was contrary to it. The inevitable result is that the order in question is void. However, although in such circumstances, as far as concerns the present controversy, the issue that has been presented by the petitioner as to whether the order of which complaint is made is violative of its constitutional rights in that, if put in operation, the order would deprive the petitioner of the use of its property without rendering adequate or any compensation therefor, is not necessary of determination,—nevertheless it is deemed advisable that some consideration of the point be given by this court.

As hereinbefore has been indicated, in substance, the statute provides that for the purpose of meeting competition,—without first having obtained the consent of the commission—a common carrier may not establish a rate which will be less than the maximum reasonable rate. And petitioner contends that if, within the "zone of reasonableness", by reason of its superior equipment, facilities and efficient management of its business, it is able to transport freight at a rate that is less than that at which its competitors can afford to transact the business, a conferred statutory power which purportedly prevents it from doing so amounts to a taking of property, or the use thereof, in violation of the several "due-process" clauses of both the state and the federal Constitutions.

In Words and Phrases, volume 3, page 2229, it is said: "The definitions of 'due process of law' are so various that it is unsatisfactory to attempt an accurate definition. It is sufficient to say that it was intended to protect property from confiscation by legislative enactments, and from seizure, forfeiture, and destruction without trial and conviction by the ordinary modes of judicial proceedings. *Davis* v. *State*, 68 Ala. 58, 62, 63 [44 Am. Rep. 128]." To the same effect

see *Chambers* v. *Gilbert,* 17 Tex. Civ. App. 106 [42 S. W. 630, 631] ; *Commonwealth* v. *Gallo,* 275 Mass. 320 [175 N. E. 718, 721, 79 A. L. R. 1380]. In the case of *Pacific Tel. etc. Co.* v. *Eshleman,* 166 Cal. 640, 664 [137 Pac. 1119, 1127, Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652], in part it is said : "Another principle, quite as important and quite as fundamental, is that 'taking' of property within the meaning of the constitution is not restricted to a mere change of physical possession, but includes a permanent or temporary deprivation of the owner of its use. The principle is thus stated by Lewis on Eminent Domain as follows : 'If property then consists not in tangible things themselves, but in certain rights in and appurtenant to those things, it follows that when a person is deprived of any of those rights he is to that extent deprived of his property and hence that his property may be taken in the constitutional sense though his title and possession remain undisturbed; and that it may be laid down as a general proposition based upon the nature of property itself that whenever the lawful rights of an individual to the possession, use or enjoyment of his land are in any degree abridged or destroyed by reason of the power of eminent domain, his property is *pro tanto* taken and he is entitled to compensation.' (2d ed. sec. 56, 3d ed. sec. 65.) 'It is also clear that to take the use of property is to take property within the meaning of the constitution. . . . ' "

Having in mind such principles, we pass to a consideration of the contention of the petitioner that the order, viewed in the light of the provisions of section 13½, deprives it of its property without due process of law. In the course of its argument to the effect that the provisions of that section as applied by the commission denies it the right, theretofore enjoyed by it, to fix its own rates within a so-called "zone of reasonableness", the petitioner relies in part upon certain rulings which appear to have been made in the following cases : *Lang* v. *Railroad Com.,* 2 Cal. (2d) 550 [42 Pac. (2d) 639] ; *Interstate Commerce Com.* v. *Alabama Midland Ry.,* 168 U. S. 144 [18 Sup. Ct. 45, 42 L. Ed. 414] ; *Interstate Commerce Com.* v. *Chicago G. W. Ry.,* 209 U. S. 108, 118, 119 [28 Sup. Ct. 493, 52 L. Ed. 705] ; *Texas & Pac. Ry. Co.*

v. *United States,* 289 U. S. 627 [53 Sup. Ct. 768, 77 L. Ed. 1410].

In *Lang* v. *Railroad Commission, supra* (decided prior to the enactment of section 13½), the fact was recognized that under the provisions of the act as it then stood, there existed a "zone of reasonableness" wherein the carriers might "adjust their rates so as to obtain or retain the desired traffic for their own lines". Also, in the case entitled *Interstate Commerce Com.* v. *Alabama Midland Ry.,* 168 U. S. 144, 172, 173 [18 Sup. Ct. 45, 42 L. Ed. 414], it was said: " ' . . . within the limits of the exercise of intelligent good faith in the conduct of their business, and subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers, as they were at the common law, free to make special rates looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce and of their own situation and relation to it, and generally to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits. The carriers are better qualified to adjust such matters than any court or board of public administration, and, within the limitations suggested, it is safe and wise to leave to their traffic managers the adjusting of dissimilar circumstances and conditions to their business.' " And in the case entitled *Interstate Commerce Com.* v. *Chicago G. W. Ry.,* 209 U. S. 108, 118, 119 [28 Sup. Ct. 493, 52 L. Ed. 705], the court said that: "It must be remembered that railroads are the private property of their owners; that while from the public character of the work in which they are engaged the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, yet in no proper sense is the public a general manager. . . . It follows that railroad companies may contract with shippers for a single transportation or for successive transportations, subject though it may be to a change of rates in the manner provided in the Interstate Commerce Act—*Armour Packing*

*Co.* v. *United States,* [209 U. S. 56 (28 Sup. Ct. 428, 52 L. Ed. 681)], and also that in fixing their own rates they may take into account competition with other carriers, provided only that the competition is genuine and not a pretense (citing cases).'' To the same effect, see the case entitled *Texas & Pacific Ry. Co.* v. *United States,* 289 U. S. 627 [53 Sup. Ct. 768, 77 L. Ed. 1410].

Although it might be argued that the language set forth in the foregoing quotations, considered alone, would support the contention of the petitioner that there exists a zone of reasonableness within which a rail carrier may lawfully fix its rates, nevertheless it would seem well-settled law that such asserted right on the part of a public utility to do so is limited by the terms of any particular act to the contrary thereof under which the carrier may assume to operate. With respect to such a situation, the commission concedes that prior to the enactment of section 13½ there existed a zone of reasonableness within which a carrier might fix its rates, subject to any other limitations prescribed by law; however, it contends that by the enactment of section 13½ the legislature has limited the preexisting right, to the extent indicated by that section; that the authority conferred by that section is a ''regulatory'' power, referable to the police power of the state, and therefore lawful;—and that it necessarily follows that the power conferred upon the commission by the provisions of that section is not violative of the due process provisions of either the federal or the state Constitution. In that connection, the commission asserts that there has been a gradual legislative encroachment upon the right of a public utility to fix its own rates within the limits theretofore prescribed, pointing out particularly the enactment of the Transportation Act of 1920 (49 U. S. C. A., sec. 15 (1)), wherein power was conferred upon the Interstate Commerce Commission to fix minimum as well as maximum rates; and that the delegation to a commission or administrative agency of legislative power to fix rates of a public utility is a valid delegation of the rate-making power of the legislature. In volume 22, California Jurisprudence, page 65, it is said: ''A power *to regulate* the rates which may be demanded by public service corporations is inherent in the state. . . . A general power over rates is now lodged,

however, in the Railroad Commission; and this power extends to the *regulation* of rates of every character of utility, including the transportation of passengers and goods, . . . '' (Emphasis added.) See, also, Corpus Juris, volume 51, pages 32, 33, where it is said:

''The constitutionality of statutes creating or empowering public utility commissions is governed by the rules applicable to statutes generally. Thus, except when otherwise provided by the constitution, the legislature, in pursuance of its general power to regulate public utilities, may by statute delegate to a commission the administration of laws and regulations, enacted in the proper exercise of the police power, governing utilities, subject to such limitations or restrictions as it may see fit to impose, . . . ''

In a footnote on page 33 it is said: ''In California (1) under Const., art. 12, secs. 22, 23, providing that the commission shall have such power to supervise and regulate utilities as shall be conferred upon it by the legislature, and that the legislature may confer any additional powers not inconsistent with those granted by the constitution, the legislature may delegate to the commission whatsoever authority it may see fit in the matter of management and control of utilities, the making of its orders and decrees, and the punishment for the violation thereof, all of such subject matters being germane to, and not inconsistent with, the constitutional powers conferred. *East Bay Municipal Utility Dist.* v. *State R. Com.,* 193 Cal. 603 [229 Pac. 949] ; *Pacific Tel. etc. Co.* v. *Eshleman,* 166 Cal. 640 [137 Pac. 1119, Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652], . . . ''

Additionally, the recent case entitled *American Toll Bridge Co.* v. *Railroad Com. et al.,* 12 Cal. (2d) 184 [83 Pac. (2d) 1], would seem to be a conclusive answer to the contention that the provisions of section 13½ are a valid delegation of legislative power of a regulatory nature, permitted under the exercise of the police power of this state. In that case it was held that the conferred power of fixing rates for a toll bridge was a valid legislative enactment and that the legislature had the power to exercise such authority directly or through an agency which it might create or appoint to act for that purpose.

▮▮ Although it is fundamental that whatever personal benefits to the individual may result from the exercise of the sovereign of the power of eminent domain, with its usual accompaniment of necessity of adequate compensation to be rendered to any person who might sustain a compensable injury with its consequent damage, nevertheless in the enjoyment of any private right, especially when it is affected by a public use or interest, it is a well-established rule that in the exercise of police power, the right of the individual must yield to the superior demand of public welfare. And so with the business of common carriers. They hold their several properties and exercise their respective privileges and franchises subject to legislative control which includes not only the regulation of the manner and the mode in which they may transact their business, but also the price which may be charged for the transportation of freight or passengers. And it has been ruled that legislation of that character is in violation of no contractual rights; that it ''takes away no property''; nor interferes with any vested right (9 Am. Jur., p. 449 et seq.; 11 Am. Jur., p. 1060, and authorities there respectively cited).

▮▮ However, notwithstanding the existence of a presumption of validity that attends the enactment of such legislation, if unreasonable in their effect, laws of the kind here in question may be judicially declared void. In that respect, since the necessary element of unreasonableness of the questioned statute is not capable of certain or definite measurement, it is manifest that before a determination of that condition properly may be adjudged, the quality of unreasonableness must be made clearly to appear. Primarily, in the enactment of a statute the question of its reasonableness is one for prior legislative determination, and ordinarily the legislative conclusion in that respect is regarded as final. It will be disturbed by a contrary judicial conclusion in that regard only when the questioned legislation is so manifestly unnecessary for the promotion or the preservation of the public welfare that the tribunal charged with the duty of adjudicating the matter may fittingly declare that no rational ground existed as a reason for its enactment (5 Cal. Jur., p. 714 et seq., and authorities there cited). In the instant matter, it is obvious that no unreasonableness in the provisions of the statute has been shown. To the contrary, as hereinbefore has been indicated, its reasonableness is most apparent.

It follows that the point that has been urged by the petitioner in that behalf cannot be sustained.

 With reference to a further and separate contention of the petitioner, it may be noted that section 24 of article IV of the Constitution of this state provides that:

"Every act shall embrace but one subject, which subject shall be expressed in its title. But if any subject shall be embraced in an act which shall not be expressed in its title, such act shall be void only as to so much thereof as shall not be expressed in its title. No law shall be revised or amended by reference to its title; but in such case the act revised or section amended shall be re-enacted and published at length as revised or amended; and all laws of the State of California, and all official writings, and the executive, legislative, and judicial proceedings shall be conducted, preserved, and published in no other than the English language."

In adding section 13½ to the Public Utilities Act, the legislature made use of the following title:

"An act to amend the Public Utilities Act by adding two new sections numbered sections 13½ and 32½ relating to public utilities."

In that regard, it is contended by the petitioner that the said title is insufficient in that it purports to amend the Public Utilities Act by "adding two new sections . . . relating to public utilities"; whereas without a reenactment and publication at length, as amended, the effect of the provisions of section 13½ is to completely revise the existing statutory powers and duties of the respondent commission, contrary to the express mandate of the constitutional provisions to which reference has been had.

It is obvious that the foundation upon which the asserted unconstitutionality of the act must rest is a precedent determination of the fact that by the provisions of the act, the powers and duties of the respondent commission with respect to the fixing of freight rates have been so amended as to work a complete revision of such powers and duties. In that regard, an examination of sections 13 and 32c of the Public Utilities Act, which were in force at the time when section 13½ was added to said act, discloses the situation that by the terms of the former section it was provided that: "All charges made . . . by any public utility . . . shall be just and reasonable.

Every unjust or unreasonable charge . . . is hereby prohibited and declared unlawful." (Gen. Laws 1937, pp. 3129, 3139.) And by the terms of section 32c it was provided that: "The commission shall have power . . . to fix and determine the just, reasonable and sufficient rates . . . and whenever two or more common carriers are furnishing service in competition with each other the commission shall have power . . . to prescribe uniform rates . . . to be charged . . . by all such common carriers." (Stats. 1915, p. 115, as amended by Stats. 1937, p. 2005.)

Broadly speaking, an examination of the several provisions of section 13½ discloses the pertinent facts, first that "when the needs of commerce or public interest require", a common carrier is not "prohibited" from establishing a *"lower* than a *maximum* reasonable rate". It is clear that under all then-existing statutes a *lower* than a maximum rate would be the only kind of rate that a common carrier might legally establish. Unquestionably a rate that would be *higher* than a maximum reasonable rate would be unlawful. In that respect section 13½ made no change in the law. In substance, as far as here is practically applicable, the second provision of section 13½ merely gives a common carrier a contingent right to establish a rate *less* than a maximum reasonable rate, to meet the competitive charges of other carriers, dependent upon a precedent "showing" by such common carrier and a subsequent "finding" by the commission that the proposed rate "is justified by transportation conditions". It thus becomes apparent that the only purported additional statutory requirement or condition which is expressed in section 13½ is that the proposed rate shall be "justified by transportation conditions". But as hereinbefore has been indicated, it is clear that such a requirement or condition was impliedly contained within the statutory provisions that were in force prior to the enactment of section 13½. By virtue of such former statutes, in order that a proposed rate might be established, it was necessary that it be "just, reasonable and sufficient"; and in addition thereto, by judicial construction, the "zone of reasonableness" determined its limits. In a determination of the justness, the reasonableness and the sufficiency of any proposed rate, necessarily the question of whether it was or would be "justified by transportation conditions" had not only to be considered by the commission, but also decided

in the affirmative before, in the performance of its legal duty, the commission would be authorized to make its order by which a common carrier might establish a rate that was less than a maximum reasonable rate within the ''zone of reasonableness''. In other words, to be ''just, reasonable and sufficient'', a proposed rate at least had to be ''justified by transportation conditions''. With regard to substance, the provisions of section 13½ did nothing more than to clarify the existing law. That within the intent of the constitutional provision, which is relied upon by the petitioner, the effect of the statute was neither to revise nor to amend the existing law with reference thereto, is attested by the decision of this court in the case of *Hellman* v. *Shoulters*, 114 Cal. 136 [44 Pac. 915, 45 Pac. 1057]. In that case (similarly to the title of the act herein), the title of the act indicated that its purpose was to amend an act '' . . . by adding thereto . . . relative to a system of street improvement bonds''. In part, it was therein held that:

''An act is not revised nor a section amended, within the purview of the above inhibition, by an act which adds new sections which leave in full operation all the language of the statute which it purports to amend. . . . It is evident that if this amends the Vrooman act at all it does so only by implication. It does not purport to amend any section of that act. It simply adds new sections as a whole relating to a subject which is stated. As already said, every word and sentence of the prior act is left in full operation and effect; . . . ''

The case of *People* v. *Oates*, 142 Cal. 12 [75 Pac. 337], is fully as persuasive in favor of respondent's position as is the case just cited. In deciding the pertinent issue, the language employed by the court was in part as follows:

''It is claimed that the act approved April 9, 1880, is unconstitutional and void. It is entitled 'An act to amend sections [then follow 108 sections of the Penal Code, numbered consecutively as they there occur], and to repeal sections 969 and 1025 of the Penal Code, and to add a new section thereto, to be known as section 809, to provide for prosecutions by information, and to adapt the provisions of said code thereto.' . . . The contention is,—1. That the act is a *revision* of the Penal Code, and hence required a republication of the entire code; . . . *We do not think the act before us is anything more*

*than what its title declares it to be,—viz., 'An act to amend'* the sections named and 'to repeal' certain sections named, and 'to add a new section' to the Penal Code. It is in no sense a revision of the entire code.'' (Emphasis supplied.)

See, also, *In re Byers,* 21 Cal. 446 [27 Pac. (2d) 641] ; *Los Angeles City School Dist.* v. *Odell,* 200 Cal. 637 [254 Pac. 570], and authorities there cited.

It thus becomes apparent that the contention of the petitioner to the effect that the title to the act by which section 13½ was added to the Public Utilities Act was defective, in that it was violative of the provisions of section 24 of article IV of the Constitution, cannot be sustained.

It becomes unnecessary to devote attention to other points that have been suggested by the respective parties herein for determination by this court.

As hereinbefore has been indicated, for the reason that the ''finding'' by the respondent commission to the effect that the rate proposed by the petitioner ''was unreasonably low and not justified by transportation conditions'' was not supported by the evidence, but in fact that the evidence was contrary to such ''finding'', it is ordered that the order here in review be and it is annulled.

Curtis, J., Waste, C. J., and Shenk, J., concurred.

Edmonds, J., concurred in the judgment.

Rehearing denied.