[S.F. No. 21788. In Bank, Apr. 28, 1965.]

THE PACIFIC TELEPHONE AND TELEGRAPH COMPANY, Petitioner, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents; UNITED STATES ADMINISTRATOR OF GENERAL SERVICES, Real Party in Interest.

[S.F. No. 21793. In Bank. Apr. 28, 1965.]

CALIFORNIA INDEPENDENT TELEPHONE ASSOCIATION, Petitioner, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

[S.F. 21794. In Bank. Apr. 28, 1965.]

EDWARD L. BLINCOE, Petitioner, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Respondent; THE PACIFIC TELEPHONE AND TELEGRAPH COMPANY, Real Party in Interest.

(Consolidated Cases.)

636

Pillsbury, Madison & Sutro, Eugene M. Prince, John A. Sutro, Francis N. Marshall, Arthur T. George, G. H. Eckhardt, Jr., and James B. Atkin for Petitioner in S.F. No. 21788 and for Real Party in Interest in S.F. No. 21794.

Bacigalupi, Elkus & Salinger, Claude N. Rosenberg, Charles de Y. Elkus, Jr., and Warren A. Palmer for Petitioner in S.F. No. 21793 and as Amici Curiae on behalf of Petitioner in S.F. No. 21788.

Edward L. Blincoe, in pro. per., for Petitioner in S. F. No. 21794.

O'Melveny & Myers, Harry L. Dunn, Albert M. Hart, Best, Best & Krieger, James H. Krieger, John Robert Jones, Musick, Peeler & Garrett, James E. Ludlam, Peter C. Bradford, Carl M. Franklin, Richard H. Peterson, Frederick T. Searls, John C. Morrissey, William L. Cole, Sherman Chickering, Bruce M. Casey, Jr., C. Hayden Ames, Charles F. Lipman, Chickering & Gregory, Rollin E. Woodbury, Robert J. Cahall, John Ormasa, Milford Springer, McCutchen, Doyle, Brown, Trautman & Enersen, Burnham Enersen, Charles E. Goulden, H. Harold Leavey, Brobeck, Phleger & Harrison and Robert N. Lowry as Amici Curiae on behalf of Petitioner in S.F. No. 21788.

Richard E. Tuttle, Roderick B. Cassidy, J. Thomason Phelps, William R. Roche, William N. Foley, Catherine D. McAndrew and Sandra H. Cox for Respondents.

Roger Arnebergh, City Attorney (Los Angeles), Charles Sullivan, Deputy City Attorney, Thomas M. O'Connor, City Attorney (San Francisco), Orville I. Wright, Deputy City Attorney, Edward T. Butler, City Attorney (San Diego) and Edwin L. Miller, Jr., Assistant City Attorney, as Amici Curiae on behalf of Respondents.

John W. Douglas, Assistant Attorney General (United States), Cecil F. Poole, United States Attorney (San Francisco), Morton Hollander, David L. Rose and Edward Berlin for Real Party in Interest in S.F. No. 21788.

BURKE, J.—On July 26, 1962, respondent Public Utilities Commission of the State of California (commission) on its own motion initiated a general investigation of the rates, charges and services of petitioner The Pacific Telephone and Telegraph Company (Pacific). Extended hearings were held, and in June 1964 the commission issued its decision No. 67369 ordering that Pacific's intrastate rate of return and its

rates be reduced for all service rendered on and after July 26, 1962, and that Pacific refund to customers some $80,000,000 collected since that date in excess of the new rates prescribed by the commission in its June 1964 order. By decision No. 67498 the commission denied rehearing of decision 67369. Pending this court's review of the proceedings the operative effect of decision 67369 has been stayed by the commission.[1]

The proceedings are also attacked by two other petitions for review.

We have concluded that as contended by petitioner Pacific the commission exceeded its authority in ordering the refund, but that no error has been shown otherwise which would warrant interference by this court.

## I. *Background*

Pacific is one of 20 principal telephone operating subsidiaries of American Telephone and Telegraph Company (American) which holds approximately 90 per cent voting control of Pacific through ownership of Pacific stock. These 20 subsidiaries, together with two operating companies in the United States in which American owns less than a majority interest, are termed "Associated Companies." American also owns Western Electric Company, Inc. (Western or Western Electric), which is the manufacturing branch of the Bell System and also acts as purchasing agent and supply department, storekeeper, developer, installer, repairer, and salvager for the Associated Companies and Long Lines Department of American. American and Western each own 50 per cent of the outstanding capital stock of Bell Telephone Laboratories, Inc. (Bell Labs), which is the research and development branch of the Bell System. The Associated Companies, Western, and Bell Labs, together with American form the Bell System.

Under the terms of an agreement termed the "license contract" American carries on research and development work through Bell Labs; furnishes to the Associated Companies advice, assistance and services in a wide variety of matters pertaining to the conduct of their business; and arranges for the manufacture of telephones and telephonic devices and apparatus by Western. Employees are frequently transferred

---

[1]The stay order was granted upon certain conditions, including the filing of a plan for refunding to customers amounts thereafter collected in excess of the lower rates fixed by decision 67369, in the event that decision be affirmed by this court. (See *People* v. *Superior Court* (1965) *ante*, p. 515 [42 Cal.Rptr. 849, 399 P.2d 385].)

between American or other Bell System companies and Pacific; in such case the employee retains full pension credit for prior service.

Until June 30, 1961, Pacific operated in California, Washington, Oregon, Idaho, and, through a wholly owned subsidiary, in Nevada. Since that date Pacific has operated only in California and Nevada, its properties in the other three states having been sold.

Pacific's toll telephone network is interconnected with other Bell System toll facilities, the major portion of which is owned and operated by American. Revenues from interstate message toll telephone business are divided among partcipating Bell System companies under a "division of revenues" contract which is designed to yield a uniform rate of return upon each company's net investment devoted to such interstate business.

Pacific also interconnects with facilities of a number of independent telephone companies,[2] not affiliated with the Bell System, pursuant to contracts negotiated from time to time between the parties. Among other things such contracts specify the basis upon which divisions of costs and revenues are made.

During the period 1948 to 1958 Pacific requested California intrastate rate increases on seven occasions and was granted approximately 48.9 per cent of the requested amounts. In each rate proceeding during that period Pacific requested a rate of return of 6.75 per cent or greater. Between 1948 and 1954 the authorized rate was 5.6 per cent. In 1954 it became 6.25 per cent (53 Cal. P.U.C. 275), and in 1958 it became 6.75 per cent (56 Cal. P.U.C. 277, 290).

During the course of the commission's investigation in the present proceeding, which as noted commenced July 26, 1962, Pacific filed an application seeking intrastate rate increases of almost $44,000,000 per year and further seeking a rate of return of 6.89 per cent on its claimed intrastate rate base of something over $2,000,000,000. Also, the intervening cities of Los Angeles and San Francisco in March 1963 requested the commission to issue an interim order immediately reducing Pacific's gross rates over $15,000,000 on an annual basis; the commission declined to do so.[3]

---

[2] California Independent Telephone Association (the independents), the trade association of 43 independent companies, is one of the petitioners for review herein.

[3] During oral argument before this court the cities urged that the commission should have granted their motion. However, the matter is

Following 49 days of public hearing during the period of January to October 1963, the commission took the proceeding under "partial submission for a final determination of [Pacific's] reasonable test year intrastate revenues, expenses and rate base as well as a determination as to what is a fair rate of return for [Pacific's] intrastate operations." Also taken under submission was Pacific's motion for rate relief, except those parts thereof which related to the manner of spreading proposed rate increases. The submission contemplated that if, based upon a resolution of the foregoing issues, the commission found rate decreases to be warranted, the commission would at that time fix rates on an interim basis pending further "hearing and determination of issues relating to rate spread and others." In case of a finding that rates should remain unchanged or be increased, further hearings were likewise contemplated on the rate spread and other issues.

Both Pacific and the independent telephone companies opposed the partial submission, contending that the issues of rate spread and of settlements with the independent companies with which Pacific interconnects, with respect to toll and exchange traffic, could not "fairly be divorced from any interim rate reduction order" and that any such reduction would necessarily be made on an incomplete record on these issues and without evidence on which the commission could make findings on such issues.

In June 1964 the commission issued its decision ordering that Pacific's rate of return be reduced to 6.3 per cent from the 6.75 per cent ordered in 1958, that its rates be reduced accordingly, and that petitioner make the refund hereinabove mentioned; and further ordering that "This investigation is continued." This review of the commission proceedings followed.

■ It appears that in telephone rate proceedings in California the general approach employed by the commission, and followed in the present case, is to determine with respect to a "test period" (1) the rate base of the utility, i.e., value of the property devoted to public use, (2) gross operating revenues, and (3) costs and expenses allowed for rate-making purposes, resulting in (4) net revenues produced, sometimes termed "results of operations." ■ Then, by determining the fair and reasonable rate of return to be fixed or allowed the utility upon its rate base, and comparing the net revenue

---

not properly before us. The cities have appeared in opposition to the review sought by Pacific, rather than as petitioners asking review and annulment of any portion of the commission's decision.

which would be achieved at that rate with the net revenue of the test period, the commission determines whether and how much the utility's rates and charges should be raised or lowered. The commission here followed its long-established principle of determining rate base by taking original cost of the property devoted to public service, and deducting depreciation therefrom. ■ The test period is chosen with the objective that it present as nearly as possible the operating conditions of the utility which are known or expected to obtain during the future months or years for which the commission proposes to fix rates. The test-period results are "adjusted" to allow for the effect of various known or reasonably anticipated changes in gross revenues, expenses or other conditions, which did not obtain throughout the test period but which are reasonably expected to prevail during the future period for which rates are to be fixed, so that the test-period results of operations as determined by the commission will be as nearly representative of future conditions as possible. The test period employed in the instant case was the 12-month period ending September 30, 1962, and was chosen with the consent of Pacific.

In this review proceeding, Pacific, as petitioner, challenges not only the refund order of the commission and the reduction ordered in Pacific's rate of return, but also charges that the commission unlawfully disallowed various items or amounts which should have been included in Pacific's rate base (resulting in an allowed rate base of $1,996,533,000 rather than the $2,054,278,000 sought by Pacific) and in test-period expenses, with consequent confiscation of Pacific's property, and, further, that the commission omitted to make findings on numerous material issues as required by statute. Pacific is both supported and opposed by various amici curiae. The independents and their association also support Pacific, and (in a separate petition for review) advance additional contentions on their own behalf. The Utility User's League of California, appearing by its President Edward L. Blincoe (Blincoe, also a petitioner for review herein) opposes Pacific.

## II. *General Legal Principles*

■ The Legislature, pursuant to its plenary power over the commission respecting public utilities (Cal. Const., art. XII, § 23), has provided in sections 728 and 729 of the Public Utilities Code[4] for commission authority to investigate public

---

[4]All section references herein will be to the Public Utilities Code of California, unless otherwise stated.

utility rates, upon a hearing, and establish new rates. Section 1756 provides for review by this court "for the purpose of having the lawfulness of the [commission's] . . . order or decision . . . inquired into and determined." Section 1757 states that ". . . The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State. The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review except as provided in this article. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination."

Section 1760 directs that "In any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the Constitution of the United States, the Supreme Court shall exercise an independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the constitutional question shall not be final."

■ Section 1760 is the codification of a paragraph added by 1933 amendment to former section 67 of the Public Utilities Act. (Stats. 1933, p. 1157.) The amendment was responsive to apprehension concerning the sufficiency of the court review provided by our statute when federal constitutional questions were involved; it did not have the effect of changing the powers and duties of the commission or of this court theretofore existing in the consideration of such questions, nor was it intended to attempt to transfer to this court the traditional regulatory functions of the commission or to constitute the court the arbiter of disputed questions of fact in matters coming before the commission. (*Southern Pac. Co.* v. *Public Utilities Com.* (1953) 41 Cal.2d 354, 360-362 [260 P.2d 70].)

■ Otherwise stated, the question of the weight of the evidence in determining issues of fact lies with the commission acting within its statutory authority; the "judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence." (*American Toll Bridge Co.* v. *Railroad Com.* (1938) 12 Cal.2d 184, 192 [83 P.2d 1], affd. 307 U.S. 486 [59 S.Ct. 948, 83 L.Ed. 1414]; see also *California Portland Cement Co.* v. *Public Utilities Com.* (1957) 49 Cal.2d 171, 175 [315 P.2d 709].)

Further, the provision of section 1757, that the findings and conclusions of the commission on questions of fact shall be final, refers to findings and conclusions "arrived at from the consideration of conflicting evidence and undisputed evidence from which conflicting inferences may reasonably be drawn. Findings and conclusions drawn from undisputed evidence and from which conflicting inferences may not reasonably be drawn, present questions of law." (*Southern Pac. Co. v. Public Utilities Com., supra,* 41 Cal.2d 354, 362.)

The fixing of rates is a legislative act. (*American Toll Bridge Co. v. Railroad Com., supra,* 12 Cal.2d 184, 191; see also *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 630 [268 P.2d 723].) The standard is that of reasonableness.

One challenging a rate-fixing order on constitutional grounds of confiscation is charged with the burden of showing that the evidence does not support the commission's findings and that the rate as finally fixed is unreasonable and will result in confiscation. Such burden is coupled with a strong presumption of the correctness of the findings and conclusions of the commission, which may choose its own criteria or method of arriving at its decision, even if irregular, provided unreasonableness is not "clearly established. Thus responsibility for rate fixing, insofar as the law permits and requires, is placed with the commission, and unless its action is clearly shown to be confiscatory the courts will not interfere." (*Market St. Ry. Co. v. Railroad Com.* (1944) 24 Cal.2d 378, 397-399 [150 P.2d 196], affd. 324 U.S. 548 [65 S.Ct. 770, 89 L.Ed. 1171], rehg. den. 324 U.S. 890 [65 S.Ct. 1020, 89 L.Ed. 1438] ; see also *Pacific Tel. & Tel. Co. v. Public Utilities Com.* (1950) 34 Cal.2d 822, 825 fn., 826, 832 [215 P.2d 441] ; *Dyke Water Co. v. Public Utilities Com.* (1961) 56 Cal.2d 105, 129 [14 Cal.Rptr. 310, 363 P.2d 326].)

Further, the primary purpose of the Public Utilities Act is to insure the public adequate service at reasonable rates without discrimination; and the commission has the power to prevent a utility from passing on to the ratepayers unreasonable costs for materials and services by disallowing expenditures that the commission finds unreasonable. (*Pacific Tel. & Tel. Co. v. Public Utilities Com., supra,* 34 Cal.2d 822.)

Formerly the findings required as a basis for an order or decision of the commission were only those of "ultimate" facts. (See *California Motor Transport Co. v. Public Utilities Com.* (1963) 59 Cal.2d 270, 273 [28 Cal.Rptr. 868, 379 P.2d 324] ; *Southern Pac. Co. v. Railroad Com.* (1939) 13 Cal.2d

89, 107 [87 P.2d 1055].) However, in 1961 section 1705 was amended to require that the commission's "decision shall contain, separately stated, findings of fact and conclusions of law by the commission on all issues material to the order or decision." Thereafter this court pointed out in *California Motor Transport Co.* v. *Public Utilities Com., supra,* at pp. 273-274, with respect to an ultimate finding of public convenience and necessity, that "Every issue that must be resolved to reach that ultimate finding is 'material to the order or decision.' Statutes like section 1705 have been held to require findings of the basic facts upon which the ultimate finding is based. [Citations.] Before section 1705 was amended findings other than the ultimate finding . . . were not required. [Citations.] It is reasonable to assume that the amendment of section 1705 was not an idle act and that it was the purpose of the Legislature to change the existing law by requiring findings on all material issues." The opinion further emphasizes (pp. 274-275) that such findings afford a rational basis for judicial review and assist the reviewing court to ascertain the principles relied upon by the commission and to determine whether it acted arbitrarily, as well as assist parties to know why the case was lost and to prepare for rehearing or review, assist others planning activities involving similar questions, and serve to help the commission avoid careless or arbitrary action, as "There is no assurance that an administrative agency has made a reasoned analysis if it need state only the ultimate finding of public convenience and necessity." In the cited case the commission's order was annulled for failure to make complete findings. The opinion declares that "Though it is within the discretion of the commission to determine the factors material to public convenience and necessity [citations], section 1705 requires it to state what those factors are and to make findings on the material issues that ensue therefrom." (P. 275 of 59 Cal.2d; see also *Associated Freight Lines* v. *Public Utilities Com.,* 59 Cal.2d 583 [30 Cal.Rptr. 466, 381 P.2d 202].)

In the present case the commission's decision comprises some 155 pages. It contains extensive discussion of issues and of evidence, and sets forth findings with respect thereto. As already noted, Pacific attacks among other things various disallowances of amounts Pacific sought to have included in its test-period rate base and expenses. Such attacks commingle charges that material issues were presented on which the decision fails to contain the more complete findings and conclu-

sions now required by statute, that findings in Pacific's favor on such issues are compelled by the law and the record, and that the omitted findings would necessarily negate certain other findings and conclusions adverse to Pacific which appear in the commission's decision and which Pacific claims bring about confiscation of its property. These challenges, which are found to be without merit in the light of the principles set forth hereinabove, will be treated later in this opinion.

We deem it appropriate, however, to comment at this point that the decision of the commission impresses us with its careful and detailed statement of the contentions of the parties and its analysis of the evidence presented, as well as its explanations of the extensive findings and conclusions set forth. Pacific's extraordinary assertion that in treating the test-year rate base and expenses "the flavor of the decision evinces anything but an objective and unbiased approach" and discloses "the biased approach of the Commission itself" is controverted by a reading of the decision. The same may be said of Pacific's charges that the commission refused to make findings of the facts essential to the issues, but instead "Fabricated a final conclusion and order upon . . . nonfactual 'determinations' unsupported by . . . evidence, contrary to . . . undisputed evidence, and violative of all concepts of fair hearing and due process of law."

### III. *Refund Order*

The commission found that the rates of Pacific which had been fixed by the commission in 1958 should be reduced by $40,722,000 annually from and after July 26, 1962, the date the commission initiated its investigation in the present proceeding and just short of two years *before* issuance of its decision (June 11, 1964), which it ordered to become effective 20 days thereafter. (Cf. § 1705 re effective dates; *California Motor Transport Co.* v. *Public Utilities Com., supra,* 59 Cal.2d 270, 272-273.) The commission, for the first time in its history, further ordered that the utility refund to customers amounts collected during the interim in excess of the reduced rates; the total refund ordered thus approaches $80,000,000. The refund order is vigorously challenged by Pacific, by the independent telephone companies, and by various amici curiae.

As amended in 1911 section 23 of article XII of the California Constitution specifies in pertinent part that the commission "shall have and exercise such power and jurisdiction to supervise and regulate public utilities . . . and to fix the

rates to be charged . . . as shall be conferred upon it by the Legislature, and the right of the Legislature to confer powers upon the . . . Commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution. . . .'' As to the scope of the commission's power in this respect ''we look to the legislation enacted . . . principally the Public Utilities Code, and to the decisions of this court in construing them.'' (*People* v. *Western Air Lines, Inc., supra,* 42 Cal.2d 621, 634.) So doing, we have concluded that the Legislature has not undertaken to bestow on the commission the power to roll back general rates already approved by it under an order which has become final, or to order refunds of amounts collected by a public utility pursuant to such approved rates and prior to the effective date of a commission decision ordering a general rate reduction. Therefore we do not reach the question whether such an order if made with the sanction of the Legislature would violate the due process or any other clause of the federal Constitution.

Section 728 of the Public Utilities Code provides so far as here material that ''Whenever the commission, *after* a hearing, finds that the rates . . . demanded, observed, charged, or collected by any public utility for or in connection with any service . . . are . . . unreasonable, . . . the commission shall determine and fix, by order, the just, reasonable, or sufficient rates . . . *to be thereafter* observed and *in force.*'' (Italics added.)

As Pacific states, this language is plain and unambiguous. The Legislature has instructed the commission that after a hearing it is to make its order fixing rates to be in force *thereafter*. In *Public Utilities Com.* v. *United Fuel Gas Co.* (1943) 317 U.S. 456, 464 [63 S.Ct. 369, 87 L.Ed. 396], almost identical language of an Ohio statute[5] was construed to give the state commission ''power to prescribe . . . rates prospectively only. . . . [T]he new rates are prospective as of the date they are fixed. There is no basis in the statute for concluding that the Commission's orders can be retroactive to the date when the Commission's inquiry into the rates was begun; on the contrary, the explicit language of the statute precludes such a construction.'' The same court in *Federal Power Com.* v.

---

[5] The Ohio statute provided that if, after a hearing, the commission found that the rate was unjust, unreasonable, or otherwise unlawful, it must ''fix and determine the just and reasonable rate . . . *to be thereafter* . . . *charged* . . . or *collected* . . . and order the same substituted therefor.'' (Italics added.)

*Hope Natural Gas Co.* (1944) 320 U.S. 591, 618 [64 S.Ct. 281, 88 L.Ed. 333], when considering a provision of the Natural Gas Act (15 U.S.C. 717d(a)) that "Whenever the [Federal Power] commission, after a hearing," finds a rate to be unreasonable, it shall determine the reasonable rate "to be thereafter observed and in force," pointed out that the commission's "power to fix rates admittedly is limited to those 'to be thereafter observed and in force,' " and did not extend to rates previously in force.

Other courts have reached the same conclusion with respect to similar language. In *Indiana Tel. Corp.* v. *Public Serv. Com. of Indiana* (1960) 131 Ind.App. 314 [171 N.E.2d 111, 124], the commission granted a rehearing of its order increasing rates but ordered the increased rates to continue in effect meanwhile; its subsequent order issued almost one year later which cancelled the increase and ordered refund of amounts collected in excess of the former rates was reversed with the holding that the commission had no powers except those conferred by statute, which provided for power to fix rates in the future but not in the past.[6] In *Michigan Bell Tel. Co.* v. *Michigan Public Service Com.* (1946) 315 Mich. 533 [24 N.W.2d 200], the commission ordered rates previously approved by it to be reduced and $3,500,000 refunded to customers covering the period of approximately one year prior to the reduction order; a lower court decree vacating the commission's order was affirmed on appeal, with an extensive analysis by the Michigan Supreme Court of relevant case authority (pp. 203-209 [24 N.W.2d]) and rejection of the commission's contention (pp. 205-206 [24 N.W.2d]) "that from its broad statutory powers[7] it should be *implied* that

---

[6]The Indiana statute provided that "Whenever, upon an investigation the commission shall find any rates . . . to be . . . unreasonable . . . , the commission shall determine, and by order fix . . . reasonable rates . . . to be . . . followed *in the future* . . . ." (Italics added.)

[7]From the court's opinion it appears that the Michigan Act provided that the commission "is hereby vested with complete power and jurisdiction to regulate all public utilities in the state . . . except as otherwise restricted by law. It is hereby vested with power and jurisdiction to regulate all rates . . . and all other matters pertaining to the . . . operation, or direction of such public utilities. It is further granted the power and jurisdiction to hear and pass upon all matters pertaining to or necessary or incident to such regulation of all public utilities . . . other than railroads and railroad companies" (p. 202 of 24 N.W.2d), and, further, that if after a hearing a rate "shall be found to be unreasonable . . . the commission shall . . . fix and order substituted therefor, such rate or rates . . . as is or are . . . reasonable, and which shall be the maximum to be charged *in the future.* . . ." (P. 205 [24 N.W.2d]; italics added.)

. . .

the commission is authorized to retroactively adjust charges or rates previously fixed, when circumstances arise which seem to call for such readjustment. In fixing rates the commission acts in a legislative capacity . . . . [W]e cannot find that the commission has either express or implied statutory power to retroactively reduce appellee's rates or its accrued earnings. Instead the commission's rate-fixing orders are effective only prospectively.'' (See also *Cheltenham & Abington Sewerage Co.* v. *Pennsylvania Public Utility Com.* (1942) 344 Pa. 366 [25 A.2d 334, 338] ; *Peoples Natural Gas Co.* v. *Pennsylvania Public Utility Com.* (1943) 153 Pa.Super. 475 [34 A.2d 375, 387-388] ; *Commonwealth* ex rel. *Town of Appalachia* v. *Old Dominion Power Co.* (1945) 184 Va. 6 [34 S.E.2d 364, 366 et seq.] ; *Georgia Public Service Com.* v. *Atlanta Gas Light Co.* (1949) 205 Ga. 863 [55 S.E.2d 618, 631].) In at least two cases it has been held that a utility whose rates had been commission-approved could not be compelled to make refunds of new and increased rates collected under a commission order set aside on appeal, where the order had not been stayed. (See *Keco Industries, Inc.* v. *Cincinnati & Suburban Bell Tel. Co.* (1957) 166 Ohio St. 254 [141 N.E.2d 465, 468-469], appeal dism., cert. den. 355 U.S. 182 [78 S.Ct. 267, 2 L.Ed.2d 187] ; *Mandel Bros., Inc.* v. *Chicago Tunnel Terminal Co.* (1954) 2 Ill.2d 205 [117 N.E.2d 774, 776-777].)

This court has also declared the principle that ''The fixing of a rate in the first instance is prospective in its application and legislative in its character. Likewise the reducing of that rate would be prospective in its application and legislative in its character.'' (*Southern Pac. Co.* v. *Railroad Com.*, 194 Cal. 734, 739 [231 P. 28] ; see also *People* v. *Western Air Lines, Inc., supra,* 42 Cal.2d 621, 630.) The conclusion that the Legislature is likewise cognizant and approving of this principle is inescapable from the language of section 728, previously noted, instructing the commission to first hold a hearing and then make its order fixing rates to be *thereafter* observed. The commission's suggestion that its order in the proceedings now under review was not unlawfully retrospective because it purported to relate back only to the date the commission initiated its investigation, rather than to affect any earlier period, is negated by the holdings of the cases hereinabove cited and discussed, as well as by the language of the California statute.

Cases relied on by the commission are distinguishable. *Boston & Worcester R.R. Corp.* v. *Western R.R. Corp.* (1859) 80 Mass. (14 Gray) 253, 265, involved construction of a statute

requiring railroads with interconnecting lines to render service to each other in return for reasonable compensation. In *United States* v. *New York Central R.R. Co.* (1929) 279 U.S. 73, 78 [49 S.Ct. 260, 73 L.Ed. 619], it was held that under a statute requiring railroads to carry mails in return for reasonable compensation, under penalty of a fine for refusal, the companies had a constitutional right to receive compensation from the government fixed as of the date they applied therefor. *T.W.A.* v. *Civil Aeronautics Board* (1949) 336 U.S. 601 [69 S.Ct. 756, 93 L.Ed. 911], also involved payment by the government for mail carriage, but under a statute authorizing the board to fix reasonable rates therefor and ''to make such rates effective from such dates *as it shall determine* to be proper'' (italics added); the court held (p. 605) that this express ''make effective'' clause was intended to authorize rates retroactive to the date of the airline's application, but no earlier, and further noted that utility rates fixed by public authorities are usually prospective. *Pacific Coast Elevator Co.* v. *Department of Public Works* (1924) 130 Wash. 620 [228 P. 1022, 1028-1029], mentions no pertinent state statute comparable to California's section 728; further, the rates the commission ordered reduced had not theretofore been approved by it. In *United Gas Public Service Co.* v. *State* (Tex.Civ.App. 1935) 89 S.W.2d 1094, 1104, the refund had been made a condition of stay on appeal from an order reducing rates.

The commission's reliance on section 701 (formerly section 31 of the California Public Utilities Act) is likewise misplaced.[8] Whatever may be the scope of regulatory power under this section, it does not authorize disregard by the commission of express legislative directions to it, or restrictions upon its power found in other provisions of the act or elsewhere in general law. (See *Pacific Tel. & Tel. Co.* v. *Public Utilities Com., supra,* 34 Cal.2d 822, 828 et seq., in which the commission unsuccessfully urged that section 701 taken with other provisions of the act empowered it to regulate contracts between affiliated corporations.)

The same is true of the provision of section 729, also cited by the commission.[9] From 1915 (Stats. 1915, ch. 91,

---

[8]Section 701: ''The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.''

[9]Section 729: ''The commission may, upon a hearing, investigate a single rate, classification, rule, contract, or practice, or any number

654

p. 132) until the Public Utilities Act was codified in 1951, the provisions now found in sections 728 and 729 comprised paragraphs (a) and (b), respectively, of section 32, and at all times the section instructed the commission to first hold a hearing, and then fix rates to be *thereafter* observed and in force. As pointed out by Pacific, the provisions of paragraph (b), now section 729, make it clear that the commission may exercise its powers with respect to a single rate, rule or practice, or any particular group thereof, and do not purport to negate or render redundant and meaningless the express direction of paragraph (a), now section 728, that the commission's order shall fix the rates to be thereafter in force.[10] "[S]tatutes are to be interpreted to give a reasonable result consistent with the legislative purpose." (*River Lines, Inc.* v. *Public Utilities Com., ante,* pp. 244, 247 [42 Cal.Rptr. 104, 398 P.2d 144].)

Further, we note that the Legislature has not overlooked the subject of refunds. Sections 1761 through 1766 deal with stay of commission orders pending review proceedings in this court. Provision is therein made, among other things, for the keeping of records of names and addresses of corporations or persons to whom "will be refundable" (§ 1766) amounts charged or received by the utility pending review, in excess of the charges allowed by the order of the commission, in cases of stay of a commission order lowering rates or denying the utility the right to a rate increase. If the Legislature had intended to authorize the commission to make the refund order now under review, we believe it would have so declared in unmistakable terms.

 This view is reinforced by the provisions of section 734, which directs that when a rate has been formally found reasonable by the commission and charges collected accord-

---

thereof, or the entire schedule or schedules of rates, classifications, rules, contracts, and practices, or any thereof, of any public utility, and may establish new rates, classifications, rules, contracts, or practices or schedule or schedules in lieu thereof."

[10]Pacific further points out that the antecedents of the 1915 Public Utilities Act confirm that the Legislature from the beginning, in one form or another, has given statutory expression to the principle that a rate-fixing order shall be prospective. (See Railroad Commission Act, Stats. 1911, ch.20, p. 20, § 17 [rates established by commission "shall take effect . . . [not] less than thirty days after the order"]; Stats. 1909, ch. 312, p. 499, §§ 16 and 22, pp. 502, 506-507 [commission rate order "shall take effect on the twentieth day after service of the same"; commission after hearing shall determine reasonable rates "to be thereafter observed"]; Stats. 1880, ch.59, p. 45, § 11, pp. 47-48 [rates established "shall go into force and effect on the twentieth day after service of said schedule"].)

ingly, the commission shall not order the payment of reparation upon the ground of unreasonableness. Here the charges ordered refunded by the commission had been fixed by formal finding, and so come within the principle of section 734. The commission's effort to distinguish the theory and effect of its refund order here, from those of a reparation order, lacks persuasiveness in view of the express language of section 734, particularly when considered in the light of section 728, discussed hereinabove. Neither the fact that in reparation cases the complaint is often made by private parties rather than on motion of the commission (see § 1705; *California Motor Transport Co.* v. *Public Utilities Com., supra,* 59 Cal.2d 270, 271-272; cf. *Georgia Public Service Com.* v. *Atlanta Gas Light Co., supra,* 55 S.E.2d 618, 631) nor that a reparation complaint is frequently addressed to the period before it is filed (see *Mandel Bros.* v. *Chicago Tunnel Terminal Co., supra* (Ill.) 117 N.E.2d 774, 775; *Cheltenham & Abington Sewage Co.* v. *Pennsylvania Public Utility Com., supra,* 344 Pa. 366 [25 A.2d 334]; *Arizona Grocery Co.* v. *Atchison T. & S. F. Ry. Co.* (1932) 284 U.S. 370, 381, 389-390 [52 S.Ct. 183, 76 L.Ed. 348]; cf. *Michigan Bell Tel. Co.* v. *Michigan Public Service Com., supra,* 24 N.W.2d 200, 203), can lessen the force of the legislative direction or of the rule that general rate making is legislative in character and looks to the future.

The commission advances various policy arguments as to why it should have the power to order refunds predating the hearing, findings, and rate-fixing order. Such arguments should be addressed to the Legislature, from whence the commission's authority derives, rather than to this court. As suggested by Pacific, if the Legislature believes there is a problem of unjust enrichment of a utility pending a possible rate-reduction order or any need to "take the profit out of delay," it may deal with those questions through appropriate legislation. So far, it has not done so. There is no merit in the commission's oblique suggestion that delay may be charged to Pacific here because it requested and received the full hearing to which it is entitled.

Certain of the parties argue that because the commission determined that the rate of return earned by Pacific during the test year, under the rates fixed by the commission in 1958, exceeded the 6.75 per cent allowed by the 1958 decision, the refund order now before us should be upheld at least to the extent of the excess. This suggestion likewise is without

merit.　　　It is the ''just, reasonable, or sufficient *rates*'' (italics added) which section 728 directs the commission to fix after it first finds that ''the rates ... charged, or collected ... are unreasonable.'' The determination of the rate of return to be allowed is but one step in the process.

## IV. Rate of Return

As already related, the commission ordered Pacific's rate of return reduced to 6.3 per cent from the 6.75 per cent allowed under the 1958 decision. Pacific asserts that the actual rate of return is only 5.2 per cent in view of the commission's treatment of various items contrary to Pacific's position thereon as discussed hereinafter, and that even a rate of 6.3 per cent is ''nominal'' and violates both statutory and constitutional requirements. The contention is groundless.

The commission's overall approach to the various challenged items was, as will be seen, within the bounds of reasonableness and so will not be disturbed by this court. Consequently the validity of a 5.2 per cent rate of return is not presented.

Citing *Federal Power Com.* v. *Hope Natural Gas Co.* (1944) *supra,* 320 U.S. 591, 603, and *Bluefield Waterworks & Improv. Co.* v. *Public Serv. Com.* (1923) 262 U.S. 679, 692-693 [43 S.Ct. 675, 67 L.Ed. 1176], Pacific asserts that the 6.3 per cent rate will deprive it of its right to earn a return on its rate base which will (1) be reasonably sufficient to assure confidence in its financial soundness, (2) be adequate under efficient and economical management to maintain and support its credit and attract necessary capital, and (3) provide a return to the equity owners commensurate with current returns on investment in other enterprises having corresponding risks.

The commission devotes some 20 pages of its decision to the subject of the rate of return. Therefrom it appears that Pacific presented financial evidence in support of its view through bankers, institutional investors, investment counselors, and an economist, in addition to Pacific's own officials. In general such evidence reflected the investor viewpoint as distinguished from that of ratepayers; and centered around the proposition that the minority interests in Pacific establish the market price of its stock, that its earnings should be higher, that its common stock is not an attractive investment, that Pacific plays an important role in the economic growth of California, and that under Pacific's

existing earnings it would be difficult to dispose of debentures at favorable rates and if a lower rate of return should be established Pacific would have to dispose of its debentures at very high rates, assuming it could find interested buyers in the market place.

Further, said the commission, if as Pacific claims it is one of the legitimate purposes of the commission to ''insure a healthy California economy, then we conceive the function of determining utility rates low enough to continue to attract persons, industry and commerce to California as important as that of allowing earnings as high as those advocated'' by Pacific. The commission also declared that the conclusion of Pacific's financial witnesses that unless its earnings increased they would not attract investors was not supported by the evidence. Its ''debentures are generally rated Triple A and its stock is generally rated A and ... its own witnesses could not enumerate any instance over the last five years where [its] financing efforts have been impeded in the slightest by its actual earnings.'' On the contrary Pacific's stockholders (including American) have had preemptive rights at par in past offerings regardless of market value thereby diluting per share earnings, in contrast to other large California utilities which attempt to finance new stock issues at as close as possible to existing market prices. There was also evidence to the effect that a 6.24 per cent intrastate rate of return would be sufficient to maintain credit and attract equity capital; this testimony was based upon an allowance of 8.25 per cent return on equity capital, whereas a study of 11 state regulatory commission decisions issued since 1957 showed an allowed median return on equity capital to other Bell system affiliates of only 7.75 per cent.

Pacific also argues that the equity return allowed under the commission's decision is not commensurate with current returns on investment in other enterprises having corresponding risks, and that confiscation results. Pacific's position is based on its attempt to show that the telephone industry carries more risks than do other industries and utilities, such as gas and electric companies. The decision of the commission treats this phase of the subject in detail and carefully explains the omissions in Pacific's evidence and the fallacies in its argument; in short, Pacific failed to prove its point. [21] Moreover, no unreasonable discrimination against Pacific appears; the allowed rate of return

for certain comparable other large California utilities varies from 5.75 per cent for the electric service rendered by Pacific Gas and Electric Company to 6.6 per cent for gas service provided by Southern California Gas Company. And as General Services Administration (GSA)[11] points out, it is well known that the telephone companies have almost a complete monopoly, while gas and electric utilities compete not only with each other but with nonregulated industries, such as oil.

The commission in finding a rate of return of 6.3 per cent to be fair and reasonable declared that "With the wide range in the claims now before us and with the opposing opinions of witnesses, our final determination of rate of return . . . represents the exercise of judgment on our part, having in mind the lawful interests of the ratepayer and the utility."[12] This approach accords with the "pragmatic adjustments," "total effect" and "end result" of "just and reasonable" rates reviewed and approved in *Federal Power Com.* v. *Hope Natural Gas Co., supra,* 320 U.S. 591, 602-603, upon which Pacific relies. Under such circumstances the courts will not interfere. (See also *Market St. Ry. Co.* v. *Railroad Com., supra,* 24 Cal.2d 378, 396-397, 399.)

## V. *Test-Period Rate Base and Expenses*

As already mentioned, Pacific challenges certain disallowances made by the commission of amounts Pacific sought to have included in its test-period rate base and expenses. These challenges, which we find to lack merit when approached in the light of applicable principles set forth earlier herein, are as follows:[13]

---

[11]GSA appeared in the proceedings "on behalf of the executive agencies of the United States."

[12]The commission also specifically found that "Under the rates herein prescribed [Pacific] will have a reasonable opportunity to earn a fair and reasonable return on its fair and reasonable intrastate rate base and will be afforded a reasonable opportunity to attract additional capital as reasonably may be required on reasonable terms in order to enable it lawfully to discharge its duty to the public."

[13]It may be noted that in *Pacific Tel. & Tel. Co.* v. *Public Utilities Com., supra,* 34 Cal.2d 822, 825 fn., Pacific successfully attacked those portions of a commission order which purported to regulate contract payments by Pacific to American, rather than to determine only what portion of such payments should be disallowed in fixing rates. However, Pacific, although not conceding that disallowance of any part of the payments was proper, did not there attack the disallowance, "believing that the court would not consider it in reviewing a rate-fixing order unless the rate finally fixed was confiscatory. [Citations.]"

But in determining whether the rate fixed is confiscatory the court

### 1. *Purchases from Western Electric.*

As noted hereinabove, Western is the manufacturing unit of the Bell System, and both Pacific and Western are controlled by American. Pacific purchases most of its equipment from Western; Western fixes the prices therefor. The commission found and determined that Western's profit on sales to Pacific "for rate-making purposes, should be adjusted" so as to result in a rate of return to Western not greater than the rate allowed Pacific. Accordingly, in arriving at Pacific's rate base the commission deducted $22,759,000 from payments made to Western which Pacific had included as original cost of plant, and in determining test-year expenses deducted the sum of $3,085,000 from payments by Pacific to Western. It is without question that "for the purpose of fixing rates" the commission may disallow excessive and unreasonable payments between affiliated corporations. (*Pacific Tel. & Tel. Co.* v. *Public Utilities Com., supra,* 34 Cal.2d 822, 826, 830, 832.)

Pacific urges, however, that the material issue with respect to these payments to Western is whether it was reasonable for Pacific to buy the equipment in question from Western and pay the prices charged; that reasonableness of prices paid to an affiliated supplier is established by showing that such prices are at least as low as those for which the goods could be procured otherwise and that the supplier has not exploited its affiliation so as to reap extortionate profits; and that the commission made no finding on the issue which would support its adjustments of the payments to Western.

Pacific claims that the record shows without contradiction that its cost for equipment procured from or through Western was far less than if it had purchased elsewhere or had attempted to provide its own,[14] that it established by extensive comparative statistics that the profits made by Western on manufactured items were substantially less than average profits enjoyed by the most nearly comparable manufacturing companies, and that it also proved that Western has worked

does consider the commission's treatment of items allowed or disallowed in rate base or expenses. (See *Dyke Water Co.* v. *Public Utilities Com., supra,* 56 Cal.2d 105; *American Toll Bridge Co.* v. *Railroad Com., supra,* 12 Cal.2d 184, 203-206.)

[14]For example, there was evidence that the basic black telephone instrument in common use, manufactured and sold by Western, costs Pacific $10.51, while the "equivalent and practically identical telephone instrument as available from other manufacturers" costs from $23.16 to $27.90.

continuously and successfully to reduce costs in every possible way and to pass on the savings to the Bell operating companies. In sum, says Pacific, the record shows that while Pacific was free to purchase from other sources, the costs of procurement through Western were so advantageous in almost every case that Pacific in the exercise of reasonable judgment could not but accept such cost advantages and purchase from Western where it actually did so.

The commission states in its decision that Pacific, after establishing the inherent advantages of a single large market supplied by a single large supplier of telephone material and services, compared Western's prices with those of the "much smaller non-Bell market of more than 90 manufacturers and suppliers for some similar equipment. Comparability of manufacturers and suppliers was not established and the reasonableness of other company prices, even assuming comparability, was not demonstrated. Moreover, the massive and unique market enjoyed by the nonoperating segments of American in the purchases by operating segments provides an advantage so great in volume alone in each of the fields of manufacturing, installation, purchasing and distribution that competition is effectively eliminated. Western has a stable, assured and captive market. Were American's manufacturing, supply and installation unit not more efficient than outside suppliers who do not possess the manifold advantages enjoyed by Western, the very existence of Western under American's control would be subject to great question. We find [continues the commission] that little, if any, weight can be accorded such price comparisons in judging the reasonableness of Western's prices. It is the cost to Western that is significant."

Further, according to the decision of the commission, Pacific "attempted to justify the earnings of Western, that resulted from the prices for telephone material that the Bell System determined that the Bell System should pay, by a comparison ... of various financial ratios over the years 1946-1961 for Western and for 47 selected utility suppliers (15 gas, 15 electric and 17 telephone)." However, states the commission, Pacific's "showing in this respect completely disregards the affiliation of Western with the Bell System and the unique conditions under which Western operates, is devoid of valid comparisons, and, even assuming comparability, does not demonstrate the reasonableness of earnings of the other companies. The advantage that the Bell System

has in its integrated position of being researcher, designer, engineer, manufacturer, distributor, installer, repairer, junker and ... operator of 80 percent of the telephone business in the entire continental United States makes it impossible to compare one phase of its operations, that of Western Electric, with outside companies who have none of the same spread of operations and control either in utility business or with respect to any business within which the outside companies operate. Western, in its relationship to [Pacific] and other operating subsidiaries of the Bell System, is not at all comparable to an independent manufacturing concern.''

Additionally, ''As a matter of policy [Pacific] over the years has required that it [Western] provide the equipment and instrumentalities used.... The result of such a policy has been effectively to prohibit entry of any competitive instruments into the telephone market in [Pacific's] territory. Accordingly, practically all items of communication equipment on customer premises served by [Pacific] are manufactured by Western. In those few instances where Western is not the manufacturer, the instruments are subject to prior approval and acceptance by Western. Moreover, because of the close affiliated relationship between [Pacific] and Western, [Pacific's] policy results in a substantial reduction in risk since both [Pacific] and Western have the opportunity for complete control of what instruments will be offered for public use and the degree of obsolescence that they assign to the instruments that are now in [Pacific's] operating plant.''

Pacific disputes none of the commission's factual recitals as above set forth, but nevertheless asserts that the commission's decision erroneously omits to include a finding of fact as to the reasonableness or prudence of Pacific's purchases from Western and payment of the prices charged, and that a finding in Pacific's favor was compelled by the evidence. This contention is without merit. The decision discloses that Pacific did not, and apparently could not, present convincing comparisons between the prices of Western and those of other manufacturers, or other evidence, which would establish beyond question the reasonableness for rate fixing of prices paid by Pacific to Western, its controlled affiliate. Cases cited by Pacific involved other records and other findings in other contexts, and of course do not suggest that a utility is entitled to favorable findings as a matter of right in the absence of undisputed evidence on the point. The determination of the commission in the present case that Western

is entitled to no greater return on its sales to Pacific than Pacific is entitled to earn on its operations, and that American should not be permitted through the corporate instrument of Western to subject Pacific's ratepayers to the burden of providing a greater return, is based not only on extensive findings made by the commission on the subject but also on the methods and principle theretofore followed by the commission (see Decision No. 56652, 56 Cal. P.U.C. 277, 282, in which in 1958 the commission authorized an increase in the rates of Pacific), and as the commission expressly found herein, produces a fair and reasonable result.

2. *"Credit Received" from Western Electric.*

In arriving at Pacific's rate base the commission deducted $15,000,000 from physical plant, representing plant purchased from Western and in service or in course of construction, but billing and payment for which had not yet been completed. Pacific asserts that the issue was whether such property is owned by Pacific and dedicated by it to the public service, and that the commission erroneously, arbitrarily, and in contravention of constitutional principles refused to make a finding "of this essential fact, though uncontradicted."

As disclosed by the commission's decision, however, and not controverted by Pacific, the $15,000,000 had already been included by the commission as accounts receivable in Western's net investment (rate base). The commission found that it would be unreasonable to require Pacific's ratepayers to pay earnings on this amount twice, and so deducted it from Pacific's rate base. The commission followed the same approach in the 1954 and 1958 rate cases involving Pacific (53 Cal. P.U.C. 275, 300-305; 56 Cal. P.U.C. 277, 282), the result appears logical and fair, and no error is shown. *Board of Public Utility Comrs.* v. *New York Tel. Co.* (1926) 271 U.S. 23, 31-32 [46 S.Ct. 363, 70 L.Ed. 808], and *New Rochelle Water Co.* v. *Maltbie* (1936) 248 App.Div. 66 [289 N.Y.S. 388, 397], cited by Pacific, do not involve comparable situations of double return on rate base allowance and are not persuasive here.

3. *License Fees Paid to American.*

In the test year Pacific paid to American and claimed as expenses $8,060,000 in intrastate license fees, computed as one per cent of certain revenues. The commission disallowed $570,000 of this amount as being costs related to American's

investor interest functions which should not be borne by California ratepayers. Again this approach follows commission precedent in previous rate proceedings involving Pacific, and the point is treated in detail (including extensive findings) in the decision now under review. Pacific concedes that the "legal principle" is the "same in essence as with respect to the purchases from Western Electric Company." No error by the commission appears. *Southern Bell Tel. & Tel. Co.* v. *Georgia Public Service Com.* (1948) 203 Ga. 832 [49 S.E.2d 38, 63], cited by *Pacific,* is not persuasive to the contrary; there the commission appears to have disallowed in total the license payments made to American, rather than, as here, only some 7 per cent thereof.

4. *Working Cash Allowance in Rate Base.*

The commission in its decision explains that "The purpose of including a working cash allowance in rate base is to compensate investors for capital which they have supplied to enable the company to operate efficiently and economically and for which they would not otherwise be compensated. If, through the availability and use of tax accruals, monies or other funds supplied by the subscribers, the investors are required to supply a smaller sum, their compensation should be proportionately less." (See also 48 Cal. P.U.C. 22.)

From the commission's decision it appears that after first allowing as a part of Pacific's rate base the gross working cash requirement ($8,803,000) which Pacific claimed, the commission disallowed various additional cash sums held by Pacific totaling $15,603,000, which the commission found, and Pacific does not dispute, had been accumulated by Pacific from revenues collected from customers in advance of paying expenses, taxes and depreciation; from funds provided by ratepayers to pay debenture interest; and from taxes withheld from employees. The net result was a deduction of $6,800,000 (which Pacific terms "negative working cash") from Pacific's claimed rate base for the test year.

Pacific asserts that the issue is how much working cash it must reasonably and prudently maintain and keep devoted to the public service for operating purposes, and, further, whether the $6,800,000 deducted from physical plant in the rate base is owned by it and dedicated by it to the public service. On the contrary, however, Pacific was allowed the working cash requirement which it asked, and its ownership and devotion of the property to public service is not chal-

lenged. Again the real question appears to be whether a double return should be permitted. The commission declared in its decision that "Where, as in this case, the funds supplied to [Pacific] by others than investors are greater than the amount required...for working cash, and the excess amount is not deducted from rate base, customers would be unreasonably required to pay a return on funds supplied by them to defray reasonable expenses and taxes [and debenture interest] and to provide a reasonable return on invested funds." This view appears sound and fair, the decision sets forth detailed findings on the subject, and no error is shown.

### 5. *California Bank and Corporation Franchise Tax.*

Pacific complains that in arriving at test-period expenses the commission deducted $1,425,000 from taxes actually paid under state law, and that the only issue on this point was how much tax Pacific was legally required to and did pay under the California Bank and Corporation Franchise Tax Act. (Rev. & Tax. Code, § 25102.) Pacific provides no supporting reference to the record herein, showing the amount of tax expense claimed by it and disallowed by the commission. However, from the decision of the commission and its answer filed in this review proceeding, it appears that Pacific's parent company, American, elects to file a consolidated federal income tax return to save millions of dollars of taxes that would otherwise result from the intercorporate payment of dividends. The California Franchise Tax Board requires that state taxes be paid on a combined return basis (see Rev. & Tax. Code, § 25102) ; as a result some of the intercompany dividends are subject to state income tax. For rate-fixing purposes the commission treats both federal and California taxes as though Pacific paid them by separate returns; i.e., Pacific is regarded as though it were an unaffiliated corporation, and both the tax burdens and the tax benefits resulting from Pacific's position as a unit of the Bell System are passed on to the rate payers. As the commission states in its decision, "If we were to treat this matter as [Pacific] contends, namely, determine state income tax on a consolidated return basis and federal income tax on a separate return basis, we would be forcing [Pacific's] rate payers to assume the entire load of California taxes on American's holding company functions. We have elsewhere herein found that [Pacific's] expenses for rate-fixing purposes should not include costs of American's holding company functions. Similarly, if we were to treat this matter on a consolidated return basis for both State and Federal income

tax, we would be inconsistent in our treatment of American's holding company functions. We find that the . . . separate return method for both California and Federal income tax allowance for rate-making purposes is fair and reasonable."

The income taxes allowed as test-period expenses were fixed accordingly, and no error is shown. (Cf. *Dyke Water Co.* v. *Public Utilities Com.*, *supra*, 56 Cal.2d 105, 126-127.) In *Galveston Electric Co.* v. *Galveston* (1922) 258 U.S. 388 [42 S.Ct. 351, 66 L.Ed. 678], cited by Pacific, dismissal of a federal court action to enjoin an allegedly confiscatory rate set by city ordinance was affirmed; the case did not involve the point whether the burden of higher taxes resulting from an intercorporate structure should be met by the ratepayer while the benefits of the combined return are retained by the shareholders. Nor does any of the other cases cited by Pacific touch this question.

6. *Depreciation.*

Pacific complains that the commission deducted $2,803,000 from depreciation expenses "actually recorded" and added $1,409,000 to "depreciation reserve, base." ▇▇▇ As Pacific states, it is entitled to reasonable depreciation accruals as expenses, and reasonable depreciation reserve (created by the accruals). (See *Dyke Water Co.* v. *Public Utilities Com.*, *supra*, 56 Cal.2d 105, 126-128.)

However, Pacific further argues that the commission must accept and apply in California the depreciation accruals under depreciation rates prescribed by the Federal Communications Commission and based on the total-life method. The California commission instead applied the straight-line remaining-life method, adopted by it many years ago, used in setting Pacific's rates in 1954 and 1958 (53 Cal. P.U.C. 275, 295; 56 Cal. P.U.C. 277, 287), and stated by the commission to be presently used by virtually all large California utilities except Pacific. ▇▇▇ As explained in the commission's decision, the "total-life method consists of an estimate of the number of years items of plant will be in service and an estimate of the net salvage that will be realized from the items. The annual accrual equals the cost less estimated net salvage divided by the estimated number of years items of plant will be in service.

▇▇▇ "The remaining-life method starts similarly but provides for frequent reviews of the service lives, salvage and per cent condition of the depreciation reserve with a resultant frequent correction of depreciation rates. By this process, the remaining-life method assures the recovery of cost, less salvage,

no more, no less, over the life of the property. ▮ In Decision No. 50258 (53 Cal. P.U.C. 275) this Commission thoroughly explored the relative merits of the two methods and found the remaining-life method to be the proper one for fixing [Pacific's] intrastate rates. We affirm the Commission's previous finding . . . . ''

▮ The commission appears correct in its further view that it is not bound by the depreciation rates or methods set by the Federal Communications Commission, and that ''What we are dealing with here is the determination of a fair and reasonable depreciation allowance for intrastate rate-making purposes in California. That determination lies with this Commission.'' Pacific's position on this point is without merit. (Cf. *Dyke Water Co.* v. *Public Utilities Com., supra,* 56 Cal.2d 105, 126-128.)

7. *Pension Fund Accruals.*

Pacific complains that the commission deducted $628,000 from ''pension accruals actually paid into'' Pacific's pension fund and claimed as expense, but failed to find as to the reasonableness of such accruals. Again Pacific provides no reference to the record in explanation of the amount of the deduction it asserts was made.

▮ However, it appears that in arriving at claimed test-period pension expense Pacific made ''adjustments'' for an increased rate of earnings on the pension fund (i.e., an interest assumption) and for a new pension accrual rate effective October 1, 1963 (i.e., one year *after* the end of the test period) to give effect to substantially liberalized and increased pension benefits resulting from wage negotiations concluded in September 1963. The accruals thus set up by Pacific included a payment in the course of funding, over a 10-year period, a previously unfunded actuarial reserve requirement; Pacific had requested permission from the Federal Communications Commission for permission to fund this portion over a 20-year period, but that commission had authorized only the 10-year basis.

Further, the decision of the California commission now under review includes an extensive treatment and explanation of the pension accrual expense actually allowed to Pacific for the test period. No useful purpose would be served by detailing such treatment here. Suffice it to say that Pacific requested the commission to recognize $38,700,000 annually for ''relief and pensions,'' which was $8,033,000 in excess of the amount Pacific had actually recorded for the test year.

In arriving at the amount allowed (which according to Pacific resulted in a deduction of $628,000 from the total requested), the commission adjusted test-period pension accruals to reflect a $3\frac{1}{4}$ per cent interest rate (rather than the 3 per cent rate assumed by Pacific), and employment of the "remaining cost method of amortizing the unfunded actuarial reserve requirement." This appears reasonable and is supported by the record. American in its July 15, 1963, actuarial report to Pacific recommended use of a $3\frac{1}{2}$ per cent interest rate for 1963—a rate less advantageous to Pacific than that adopted by the commission. Further, the use of the remaining cost method of amortizing the unfunded actuarial reserve requirement, rather than the 10-year amortization period urged by Pacific, also finds support in the record, was found by the commission to be reasonable, and appears consistent with the commission's use of the remaining-life method of calculating depreciation. Pacific attacks the weight that should be accorded evidence supporting the commission's view, rather than its own, but has failed to establish that the decision is arbitrary or unreasonable on this point.

8. *Property Held for Future Use.*

Pacific claimed in its rate base $2,558,000 for property held for future telephone use. The commission applied its general rule, which is applied to smaller utilities and was applied to Pacific in the 1954 and 1958 proceedings, and disallowed $273,000 which Pacific estimated would be carried on its books for more than three years before being used for telephone purposes. Pacific challenges this action as arbitrary and asserts that the commission had no choice but to find that all such property was reasonably and prudently acquired or constructed in order to avoid later excessive costs or unavailability, and to allow the full sum claimed. The contention is without merit.

The commission pointed out in its decision that even if the property is used in the future the costs associated with carrying it for periods longer than three years may well exceed the possible increase in market price and result in speculation by Pacific in real estate at the ratepayers' expense. The commission expressed the further view that in acquiring property for future use an unreasonable burden should not be imposed upon ratepayers nor should the utility be penalized if it exercised reasonable judgment; but that the utility must bear certain "risks of the business" rather than transferring them to

ratepayers, and this situation presents one such risk. Accordingly, the commission found reasonable the rate base allowance resulting after deduction of the mooted $273,000. This approach appears sound and no arbitrary result is shown.

### 9. *Donations, Contributions, and Service Club Dues.*

During the test year Pacific recorded on its books of account $160,000 of dues, donations and contributions as intrastate operating expense, and charged an additional $542,-000 to its stockholders. But in this rate proceeding Pacific sought to have the latter sum likewise included in operating expense, which would result in assumption by ratepayers of the entire $702,000. The commission found it reasonable to increase the test-year operating expenses by $145,000 over the recorded amount for this item, and allowed a total of $305,000. Pacific challenges as arbitrary the resulting disallowance of $397,000 (i.e., some 56½ per cent) of the amount claimed by it, and again charges the commission with erroneous failure to find in accordance with Pacific's assertion that in every case the contributions and dues were reasonable in amount. Amici curiae on behalf of various recipients of Pacific's contributions support this challenge, pleading worthiness of their causes and their need for funds.

Pacific states that its payments fall into four broad categories: (1) Contributions to united funds, community chests and the Red Cross, (2) contributions to colleges and universities, (3) contributions to hospitals, (4) contributions to various cultural organizations and dues to chambers of commerce and service clubs. It further appears that Pacific encourages its employees to make similar contributions and believes that its ratepayers should do so. However, Pacific's present attempt to charge all of its own contributions as an operating expense to be borne by ratepayers is plainly unwarranted. The commission in its decision observes that "Dues, donations and contributions, if included as an expense for rate-making purposes, become an involuntary levy on ratepayers, who, because of the monopolistic nature of utility service, are unable to obtain service from another source and thereby avoid such a levy. Ratepayers should be encouraged to contribute directly to worthy causes and not involuntarily through an allowance in utility rates. [Pacific] should not be permitted to be generous with ratepayers' money but may use its own funds in any lawful manner."

The commission further points out that, conceding worthiness of the donees and benefits in good will reaped by Pacific,

many ratepayers may not approve various of the donations made and they should be permitted to exercise their own free choice in such matters. Assuming that as argued by Pacific many of the objects of its bounty might otherwise require or receive support from taxpayers and that it is thus helping to keep taxes from rising, nevertheless Pacific is not authorized to exact from its customers payments in lieu of taxes. The commission's decision notes that the Federal Communications Commission in June 1963 refused American's request for permission to charge all contributions directly to operating expenses.

We believe that the view expressed by the further declaration in the decision now before us that Pacific "hereby is placed on notice that it shall be the policy of this Commission henceforth to exclude from operating expenses for rate-fixing purposes *all* amounts claimed for dues, donations and contributions" (italics added) states the correct rule; it also accords with the approach adopted in certain other jurisdictions. (See *Chesapeake & Potomac Tel. Co.* v. *Public Service Com.* (1963) 230 Md. 395 [187 A.2d 475, 485 [8]], and cases there cited.) A contrary holding is not required by decisions of other courts and other commissions, permitting all or part of a utility's contributions to be charged against its ratepayers. Accordingly, although the commission erred in allowing a total of $305,000 for donations, contributions, and service club dues as an operating expense in the test-year period, Pacific was not prejudiced thereby and none of the parties has challenged the commission's decision on the ground that the allowance was excessive.

It may be emphasized that the commission's declared future policy does not purport to prohibit the utility from making contributions but only precludes charging them against its ratepayers. Further, we have no doubt of the importance of the contributions to the donees, as so eloquently expressed by able counsel appearing in their behalf, or that the funds so received will be devoted to beneficial uses. However, we hold that the policy adopted by the commission to exclude such contributions from operating expenses for rate-fixing purposes is correct.

10. *Legislative Advocacy.*

Pacific included $17,000 as test-year operating salaries and expenses on account of legislative advocacy. In support of this item it presented evidence that it is the largest

private employer in California, the largest corporate taxpayer, and the largest private motor vehicle fleet operator; that, confronted by approximately 500 bills introduced in the average legislative session which would affect the telephone service, Pacific assigns certain employees to analyze such bills and their effect upon the telephone service and to provide necessary technical information to legislators and their staffs, with consequent substantial benefit to and protection of the telephone service.

The commission disallowed the entire $17,000 with the declaration in its decision that ''We do not here reach the issue of [Pacific's] right to engage in such activity. . . . [But when Pacific] claims benefits to its ratepayers from such activities, it is presuming to determine without consent or prior knowledge of such ratepayers what pending legislation is or is not beneficial to them. Even conceding that such activity in a given instance may prove to be beneficial to . . . ratepayers, we hold that they should not be required to pay for costs of such legislative advocacy without having the opportunity to make their own judgments on what legislative proposals they would or would not favor and to designate who, if anyone, should advocate their interests before the Legislature. Accordingly, we find that . . . test year intrastate expenses should be adjusted downward by $17,000 . . . to reasonably exclude for rate-fixing purposes [Pacific's] claimed costs of legislative advocacy.''

Pacific contends that such legislative activities as outlined in its evidence, and as distinguished from possible expenditures in attempts to improperly influence legislation and legislators, are a reasonable necessity for the operation of a public utility of the size and complexity of Pacific, and that in fixing rates the allowance of reasonable expenditures therefor would be appropriate. However, we agree with the general policy of the commission that the cost of legislative advocacy should not be passed on to the ratepayers and find the disallowance proper.

11. *Investment Tax Credit.*

As a result of federal legislation granting to business corporations the so-called ''investment credit,'' the federal income taxes for which Pacific became actually liable were reduced effective January 1, 1962, by a sum equal to 3 per cent of the amount invested in certain newly acquired depreciable equipment forming a part of Pacific's plant. (Revenue Act of 1962, 26 U.S.C. §§ 38, 46-48.) For the test period this credit totaled $4,581,000. Petitioner maintained

that in arriving at test-period net revenues it should be permitted to deduct federal income taxes in the total amount it would have incurred without the investment credit, and that the credit should be deducted from the cost of the new plant to which it applies (i.e., from the rate base), with a corresponding deduction of test-period depreciation expense from that otherwise allowed. The commission in its decision found that Pacific's "method of deducting the investment tax credit from rate base . . . should be rejected for intrastate rate-fixing purposes"; that the "flow-through" to income method of applying the credit to reduction of allowable test-period tax expense "is reasonable, is consistent with the treatment accorded the . . . credit by this Commission in the fixing of rates of other utilities in this State, and should be followed" here. Accordingly, the commission deducted the credit from test-year federal income tax expense claimed by petitioner and offset it by $340,000 for depreciation on the resulting higher rate base; the net deduction was thus $4,241,000.

The flow-through method employed by the commission immediately bestows upon ratepayers the full benefits of the tax credit accorded Pacific. Pacific's proposed method of deducting the credit from rate base, with corresponding annual deductions from depreciation expense and from revenues required to earn the allowed return upon rate base, would not deny such benefits to ratepayers but would defer them by spreading them over a period of years. Pacific claimed that its method, which it termed "service life flow-through," would actually flow through more dollars over the life of the property.

Pacific asserts that the federal Congress enacted the investment credit for the express purpose of providing to business corporations financial assistance and stimulus to modernize and expand productive facilities, by reducing the net costs of the new equipment, thereby increasing the earnings of such equipment over its productive life;[15] that this purpose was further demonstrated when, by another federal enactment effective January 1, 1964, federal regulatory agencies were specifically prohibited from using the investment credit to reduce the cost of service for rate fixing, except by consent of the utility in-

[15]At the hearings before the commission Pacific introduced evidence of various reports and hearings showing that the purpose of the tax credit legislation was so declared by the President, the Secretary of the Treasury, the House Ways and Means Committee, the Senate Finance Committee, and the Joint Conference Committee of the House and Senate.

volved and except for proportionate yearly charges against the plant facilities to which the credit applied (Revenue Act of 1964, § 203(e), 26 U.S.C. § 38 note); that the California commission in its treatment of this tax credit is unlawfully frustrating and defying congressional intent, and has not regularly pursued its authority.

Section 203(e) of the 1964 act, to which Pacific refers, is entitled ''Treatment of Investment Credit by *Federal* Regulatory Agencies'' and by its language declares among other things that ''It was the intent of the Congress in providing an investment credit under section 38 of the Internal Revenue Code of 1954 [as amended by the 1962 act] . . . , to provide an incentive for modernization and growth of private industry (including that portion thereof which is regulated). Accordingly, Congress does not intend that any *agency or instrumentality of the United States having jurisdiction* with respect to a taxpayer shall, without the consent of the taxpayer, use [the investment credit[16]] to reduce such taxpayer's Federal income taxes for the purpose of establishing the cost of service of the taxpayer or to accomplish a similar result by any other method.'' (Italics added.)

The commission does not dispute the general purpose of the investment credit as reiterated by the Congress in the 1964 act, but argues that the language italicized above demonstrates lack of congressional intent to restrict state regulatory action. This approach appears reasonable, and a contrary view is not required by *United States* v. *Georgia Public Service Com.* (1963) 371 U.S. 285, 292-293 [83 S.Ct. 397, 9 L.Ed.2d 317], or *Public Utilities Com. of California* v. *United States* (1958) 355 U.S. 534, 540-544 [78 S.Ct. 446, 2 L.Ed.2d 470], cited by Pacific, which dealt with the state regulatory action which hindered the federal government from negotiating for the least expensive transportation of government property and personnel. Nor is *Application of Montana-Dakota Utilities Co.* (N.D. 1960) 102 N.W.2d 329, 339-340, persuasive; that case dealt with amortization of an emergency facility rather than with the investment tax credit. Further, the court there commented that adding tax savings to income as proposed by the state commission ''results in a greater detriment to the taxpayer than a deduction from the rate base.'' Although Pacific here argues for the deduction from rate base, it is not altogether clear that in the long run that method would result

---

[16]Except, with respect to public utilities, the proportion of such credit noted by Pacific.

in a lesser detriment to Pacific; as already noted Pacific claims that its method would actually flow through more dollars to income over the life of the property.

In sum, the treatment accorded by the commission to the investment tax credit appears well within the ambit of the legislative process which applies to general rate fixing, is not shown to be arbitrary or unreasonable, and should not be overturned by this court. (See *American Toll Bridge Co.* v. *Railroad Com., supra,* 12 Cal.2d 184, 205 [12].)

12. *Supervisory Salaries.*

The commission disallowed as test-period expense $2,150,000 of "supervisory salaries" actually paid by Pacific. Pacific asserts without citation of authority that "Wage and salary payments are presumed to be reasonable, and must be recognized as such, until the contrary is shown," and proceeds to charge that nothing in the record shows the contrary. Pacific mentions no affirmative showing that the disallowed salary expense was reasonable or prudent, and has failed to sustain its burden of establishing commission error. Further, it is noted that the decision of the commission points out testimony of a witness from GSA, to which Pacific made no rebuttal, showing among other things that in 1956 to conduct operations in Washington, Oregon and Idaho, as well as in California, Pacific had 285 executives at division level and higher and a total employee force of 89,685; that in a six-year period from 1956 to 1962 for Pacific's California operations alone the number of executives at division level and higher increased from 201 in 1956 to 334 in 1962 (a 66 per cent increase) and they were paid aggregate salaries applicable to California of $3,125,967 in 1956 and $7,217,687 in 1962 (a 131 per cent increase); that in the same period Pacific's California employee force declined from 71,926 to 67,522 (a 6 per cent decrease). Further, although Pacific attacked this testimony as being only theoretical calculations of an unqualified witness, Pacific declined to furnish GSA with more specific information, claiming excess work effort to supply it.

The commission's decision understandably declares that "The record discloses no reason for the substantial increase in compensation for and number of supervisory personnel at division level and higher in light of the [1961] splitoff of the Oregon, Washington and Idaho properties and operations and the reduction in personnel revealed by the evidence. We find that the amount charged for such salaries in the test year

operating expenses for rate-making purposes is excessive and should be reduced by . . . $2,150,000 applicable to intrastate operations.'' No violation of the rule of reasonableness is shown.

### 13. *Post-Test-Period Adjustments.*

Pacific complains that the commission arbitrarily refused to adjust test-period results to allow for subsequent changed conditions, chiefly increased wage and salary rates and the resulting larger pension payments and payroll taxes, or to make adequate findings with respect to the claimed changes. However, Pacific does not suggest that corresponding changes which would increase future income, chiefly larger revenues and greater operating efficiencies, likewise be reflected in test-period adjustments.

The commission found that during the period of some five years following the increase in Pacific's rates permitted by the 1958 decision, the wages paid by Pacific had increased each year. However, although the telephone rates remained relatively stable, increasing revenues and wage-saving technological improvements more than offset the increased wages. For the post-test-period of 1963 the wage increases paid by Pacific over 1962 came to $20,000,000 while revenues increased some $91,200,000, thus resulting in a net revenue increase of over $71,000,000. Further, while annual revenue per telephone increased steadily from $143.13 in 1959 to $157.33 in 1963, the wages-charged expense per average telephone actually decreased during the same period, from $50.46 to $49.16; the same trend of decreasing annual wage expense charged against each $100 of revenue was experienced during the period. Thus actual experience subsequent to the test period demonstrated that increased revenues and operating economies more than offset increased wage rates. The commission further found that new and improved automated procedures and other technological improvements and economies, such as customer dialing of toll messages, will result in continuing cost savings, and that the effects of such savings and of increasing revenues ''make it unnecessary to adjust test year wages for the effects of wage rate increases'' subsequent thereto.

Again the approach of the commission appears reasonable, Pacific is in no position to complain of the refusal to make the post-test-period adjustments it sought, and no error is shown.

### VI. *Petition of the Independents.*

As already noted, the independent telephone companies in

California through their trade association also challenge the commission's decision herein. In addition to supporting Pacific's attacks on the reduction in its rates and on the refund order, the independents contend that "By the device" of a "partial submission" the commission has deprived them of an opportunity to present evidence to the commission "illustrating the drastic loss of income which will result" to them as a result of reduction of Pacific's rates.

It appears that the independents provide both long distance or toll service and local or exchange service through their own lines and also through interconnection with the lines of Pacific. Service which utilizes the lines of both Pacific and the independents is commonly referred to as interchanged traffic. Pacific and the independents have from time to time separately entered into written agreements covering the division of revenues derived from interchanged traffic, more commonly designated as settlement agreements. In this review proceeding the independents express dissatisfaction with results of their negotiations with Pacific for revised methods of settlement and state that such negotiations are presently at an impasse. They are also fearful that the reduction in the rates of Pacific will mean a possible commission order to reduce their own rates, before they have been afforded a hearing by the commission.[17]

Suffice it to say that the provisions of sections 1705 and 728 (see also § 766)[18] and the views expressed in this opinion should serve to reassure the independents to the contrary. The commission is cautioned accordingly.

### VII. *Petition of Blincoe.*

Petitioner Blincoe, for himself and as president of the

[17]This fear seems understandable. Under date of July 31, 1964, the commission requested information from Pacific as to the "actions taken or contemplated" by Pacific "to notify all connecting companies that concur in affected message toll and multi-message unit tariffs of [Pacific] as to the records they and their customers should keep in order that appropriate refunds, if any, may be made."

The commission also sent letters to the independents informing them that as a result of reduction of Pacific's rates "your company may be placed in the position of collecting *unlawful rates* during the interim period. Please advise of the manner in which your company proposes to refund to its customers all monies collected at rates other than those ultimately fixed pursuant to the court review of Decision No. 67369. A reply by August 10, 1964 is requested." (Italics added.)

[18]Section 766 authorizes the commission to prescribe joint rates, tolls, and charges for interconnecting lines, and if the telephone companies do not agree upon the division thereof "the commission may after further hearing, establish such division by supplemental order."

Utility User's League of California, a nonprofit association, makes unsupported charges that since 1947 Pacific's rates have been set by the commission on evidence fraudulently presented by Pacific and therefore have been unjust, and argues that the commission should have ordered Pacific to make a refund to customers of all sums collected since 1947 in excess of a 5 per cent rate of return on a rate base and with allowed expense to be recomputed according to theories advanced by Blincoe. Included in this argument is an attack on the method of handling depreciation allowances. From what has already been said in this opinion it is clear that fixing of the rate of return, rate base and expenses are matters falling within the scope of the commission's authority; and petitioner Blincoe has shown no basis for interference by this court.

For the reasons above stated, those portions of the commission's decision No. 67369 which purport to order and provide for a refund to customers of amounts collected by petitioner Pacific prior to the effective date of such decision are annulled. The decision is affirmed in all other respects.

Traynor, C. J., McComb, J., Tobriner, J., and Peek, J., concurred.

MOSK, J., Concurring. — I wish to explain briefly my reasons for joining in the court's holding that the commission erred in acquiescing in Pacific's past policy of sending telephone users a bill that includes the company's gifts.

In establishing a future policy "to exclude from operating expenses for rate-fixing purposes all amounts claimed for dues, donations and contributions" the commission cannot justify allowing the sum of $305,000 as part of operating expenses during the test year. Contributions, being voluntary, are by definition not necessary to the furnishing of service by the public utility. (*Central Maine Power Co.* v. *Public Utilities Com.* (1957) 153 Me. 228 [136 A.2d 726, 731].)

Although some jurisdictions have reached a contrary conclusion, I am persuaded by *Chesapeake & Potomac Tel. Co.* v. *Public Service Com.* (1963) 230 Md. 395 [187 A.2d 475], which held at page 485 [187 A.2d] : "If charitable contributions are allowed as an operating expense of a monopoly, it amounts to an involuntary levy on the ratepayers." A similar result was reached in *Peoples Gas Light & Coke Co.* v. *Slattery* (1939) 373 Ill. 31 [25 N.E.2d 482, 498].

Corporations are permitted to "make donations for the public welfare or for charitable, scientific, or educational purposes." (Corp. Code, § 802, subd. (g).) A dissatisfied stockholder may seek to change the policies of a corporation, defeat the directors, or sell his stock investment. No comparable alternatives are available to a monopoly ratepayer, whose only choice is to pay the full bill sent to him—for services rendered and gifts made in the name of the company —or abandon the use of his telephone. The unfairness is manifest.

The commission's declared future policy does not appear to prohibit the utility from making contributions but only precludes charging them as an involuntary levy on its ratepayers. This limitation is not only desirable in the future but also should have been applied to the recent test year. As stated in *Carey* v. *Corporation Com.* (1934) 168 Okla. 487 [33 P.2d 788, at 794] : "If as a matter of judgment [a gas corporation] desires to take part of its earnings, just as would an individual, and contribute them to a worthy public cause, it may do so; but we do not feel that it should be allowed to increase its earnings to take care thereof."

Counsel for Pacific and for the amici curiae argue that contributions have provided indirect pecuniary benefit to Pacific. The suggestion that charitable donations are motivated by the donor's expectation of financial return demeans the worthy institutions and beneficiaries involved. As stated in *Denver Union Stock Yard Co.* v. *United States* (1938) 304 U.S. 470, 483 [58 S.Ct. 990, 82 L.Ed. 1469, at p. 1480] : "It was not, and probably could not have been, proved that failure to respond [to requests for contributions] would adversely affect [the company's] revenue."

The commission's legislative policy for the future is commendable, but it is at least a year overdue. Protection of ratepayers requires hereafter, as it should have in the past, scrupulous adherence to that policy.

PETERS, J., Concurring and Dissenting.—I agree with the basic determinations in the majority opinion, but I disagree with what is there said about the propriety of excluding philanthropic contributions from Pacific's operating expenses. From that portion of the opinion I dissent.

The philanthropic contributions here involved include gifts to united funds, community chests, and to the Red Cross, contributions to colleges and universities, to hospitals, and

to various cultural societies. The sums involved were clearly reasonable, under the circumstances, and there is no finding that they did not benefit the corporation, and its ratepayers.

The majority opinion states that such contributions for the test year amounted to $702,000. The commission allowed $305,000 of this sum as an operating expense. Thus, the only question presented to this court was the propriety of that allowance. The majority of this court held only that Pacific could not challenge the propriety of that allowance on the ground that it was too small. But both the commission and the majority then went on to decide an issue not before them. In its opinion, the commission stated that it was putting Pacific on notice that in the future it shall be the policy of the commission to exclude all such contributions from operating expenses. How the allowance of $305,000 as part of those expenses for the test year can be justified if the threatened future policy is legally sound, which it is not, does not appear. In any event, once the commission had decided to allow the $305,000 as an operating expense the proposed future policy of the commission was not in issue. Yet the majority opinion and the concurring opinion of Mr. Justice Mosk go out of their way to approve this gratuitous statement of future policy. These holdings, both of the commission and of this court, amount to no more than advisory opinions on an issue not properly before the commission or this court. In California such advisory opinions are not permissible, and are quite dangerous to the law. Moreover, in this case, the advisory opinions are, I believe, unsound.

What is or is not a proper operating expense is a question of fact, or a mixed question of fact and law. Here the only evidence on the issue was to the effect that such contributions were reasonable in amount and purpose, that they were of a value, in excess of the expenditures, to the corporation and its ratepayers, and under present concepts of corporate responsibility, both public and private, were reasonably required. Thus a question of fact—benefit to the ratepayers —was presented to the commission. It made no findings on the issue as required by section 1705 of the Public Utilities Code. (See also *California Motor Transport Co.* v. *Public Utilities Com.*, 59 Cal.2d 270 [28 Cal.Rptr. 868, 379 P.2d 324], and *Associated Freight Lines* v. *Public Utilities Com.*, 59 Cal. 2d 583 [30 Cal.Rptr. 466, 381 P.2d 202].) Had findings been made, in view of the uncontradicted evidence on the issue, they would have had to be to the effect that such contributions

were of real benefit to the ratepayers, and the conclusion would have been inevitable that they were a proper business and operating expense.

In place of findings on this issue, all that appears in the commission's opinion is an argument to the effect that such contributions are improper because they constitute "an involuntary levy on the ratepayers." Of course, all corporate expenditures, properly approved, constitute such a levy. The real question is not whether they are an "involuntary levy," but whether such expenditures are of economic benefit to the ratepayers and are reasonable in amount and purpose.

The arguments contained in the commission's opinion, and in the majority and concurring opinions of this court, are necessarily based on the outmoded concept that philanthropic contributions, whether by a public or private corporation, are not for a corporate purpose, and are ultra vires. California has expressly repudiated this outmoded concept as to private corporations. Section 802, subdivision (g), of the Corporations Code provides that every corporation may "Make donations for the public welfare or for charitable, scientific, or ·educational purposes." (See Notes 3 A.L.R. 443, 39 A.L.R.2d 1192, 50 A.L.R.2d 447.) This section embodies the modern concept of corporate responsibility.

It is no answer to say, as do the majority and concurring opinions, that public corporations may make such contributions under section 802, subdivision (g), *supra,* and charge them to their stockholders, but cannot charge them as an operating expense. Obviously, disallowing such contributions as an operating expense will necessarily diminish the amount of such contributions, and will correspondingly lessen the assumption by such corporations of their corporate responsibilities, to the detriment of the community, of the corporation and its ratepayers.

No blanket rule prohibiting all such expenditures as operating expenses, regardless of their nature and purpose, should be approved. The determination of whether such expenditures are a proper operating expense should only be made after a proper consideration of the nature and purpose of the expenditure, and whether, in fact, it benefits the ratepayers and the corporation. This is the view expressed by many state commissions and courts as referred to in the briefs.

In our society, private charities are the recognized vehicle for handling many community problems. Most private charities operate, at least in part, with volunteers, at a cost to

the community far less than would be required if government, with its paid workers, undertook this obligation. Private charities are largely dependent on private and public corporate contributions. Aside from the social responsibility of such corporations to make such contributions, it seems obvious that encouraging and helping to support such charities is of real economic benefit to the corporations involved, and to the ratepayers of public corporations. Certainly, as a pure business proposition, it is more economical for a public corporation to support private charities than it would be if the corporation had to pay increased taxes to support government-operated activities. Of even more obvious benefit to the ratepayers are contributions to educational institutions for scholarships and research, included by the commission and this court under the term "contributions."

Thus, I first object to the court or commission discussing at all the subject of a blanket prohibition against such expenditures, because the issue is not involved. Secondly, I cannot leave unchallenged the gratuitous advisory opinion of the commission and of this court to the effect that not one cent of such expenditures shall, in the future, be included as an operating expense.

The application of petitioner Blincoe for a rehearing was denied May 26, 1965.